**Gaetano PARELLA, et al.,
Plaintiffs, Appellees,**

**v.**

**RETIREMENT BOARD OF THE RHODE ISLAND EMPLOYEES' RETIREMENT SYSTEM, Nancy J. Mayer, in her official capacities as General Treasurer of the State of Rhode Island and as Chairperson, Treasurer, and Custodian of Funds of the Retirement Board of the Rhode Island Employees' Retirement System, and Joann E. Flaminio, in her official ca-**

---

pacity as Executive Director of the Retirement Board of the Rhode Island Employees' Retirement System, Defendants, Appellants.

No. 98–1400.

United States Court of Appeals, First Circuit.

Heard Sept. 18, 1998.

Decided April 16, 1999.

48

Michael P. DeFanti, with whom Laura A. Pisaturo and Hinckley, Allen & Snyder were on brief, for appellants Retirement Board of the Rhode Island Employees' Retirement System and Joann E. Flaminio, in her official capacity as Executive

Director of the Retirement Board of the Rhode Island Employees' Retirement System.

Rebecca T. Partington, Assistant Attorney General, for appellant Nancy J. Mayer, in her official capacity as General Treasurer of the State of Rhode Island.

Anthony F. Muri, with whom Barbara S. Cohen and Goldenberg & Muri were on brief, for appellees Gaetano Parella et al.

Before BOUDIN, LYNCH, and LIPEZ, Circuit Judges.

LYNCH, Circuit Judge.

Beginning in 1987, retired Rhode Island legislators or their beneficiaries became eligible to receive annual pension benefits that were as much as sixty times greater than the legislators' annual pre-retirement salaries. When the Rhode Island General Assembly became aware that the generosity of these benefits jeopardized the tax-exempt status of the state's retirement system, it acted to bring the benefits into compliance with federal tax law by capping annual benefits at $10,000, effective July 1995. The pensioners whose benefits were thereby reduced brought suit under 42 U.S.C. § 1983 to foreclose any withholding of benefits, alleging that the benefit cap violated the Takings Clause, Contract Clause, and Due Process Clause of the United States Constitution.

While the suit was pending, Congress retroactively eliminated the federal tax code's limitations on government pensions, and the Rhode Island Retirement Board responded by refunding the withheld benefits. The pensioners then continued their suit in order to seek interest on the benefits for the time that they were withheld, as well as attorneys' fees under 42 U.S.C. § 1988. After cross-motions for summary judgment, the district court granted summary judgment to the pensioners on Takings Clause grounds, and this appeal followed.

Because of the peculiar fact pattern of this case, it raises a number of difficult constitutional issues, including several questions related to defendants' asserted Eleventh Amendment defense. We conclude that Rhode Island's temporary withholding of excess benefits did not violate the pensioners' constitutional rights; accordingly, we do not reach the other issues. We reverse the district court's grant of summary judgment on the pensioners' § 1983 claim, vacate its award of costs and attorneys' fees under § 1988, and remand for entry of summary judgment in favor of defendants.

**I**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. See Fed. R.Civ.P. 56(c). The district court based its order on the following undisputed facts.

In 1936, the Rhode Island General Assembly enacted legislation establishing a retirement system for public employees. See 1936 R.I. Pub. Laws ch. 2334 (codified as amended at R.I. Gen. Laws § 36–8–1 et seq.); see also National Educ. Ass'n— Rhode Island v. Retirement Bd. of the R.I. Employees' Retirement System, 172 F.3d 22 (1st Cir.1999) ("NEA ")(describing system's history); Kass v. Retirement Bd. of the Employees' Retirement Sys., 567 A.2d 358, 358–59 (R.I.1989) (same); McGrath v. Rhode Island Retirement Bd., 88 F.3d 12, 13–14 (1st Cir.1996) (describing related municipal pension plan). The Rhode Island retirement system is a defined benefit plan, which requires members to contribute a set percentage of their yearly salary, see R.I. Gen. Laws § 36–10–1, in exchange for a fixed retirement allowance based on years of service and salary level achieved, see id. § 36–10–10. The retirement system is administered by a retirement board ("the Board"), which is chaired by the state treasurer. See id. §§ 36–8–3, 36–8–9.

The original provisions of the retirement statute expressly excluded members of the

General Assembly from participating in the retirement system. *See* 1936 R.I. Pub. Laws ch. 2334, § 14. In 1947, the Assembly amended the statute to permit legislators to join the system voluntarily. *See* 1947 R.I. Pub. Laws ch. 1971, § 5 (codified as amended at·R.I. Gen. Laws § 36–9–6). At first, legislator contributions and benefits were based on the same rates set for ordinary employee members. *See id.* ch. 1971, § 3. Since at that time legislators' compensation was limited by the Rhode Island Constitution to $300 per year, *see* R.I. Const. art. VI, § 3 (amended 1994), legislative pensions were extremely small. Beginning in 1960, however, a series of amendments to the retirement statute increased both the rate of contribution for legislators and their maximum annual pension benefit. *See Kass,* 567 A.2d at 362–63, 364. In 1987, legislators granted themselves the last such increase. After voters rejected a proposed amendment to the Rhode Island Constitution that would have increased the nominal $300 salary, legislators acted to double their maximum pension benefit, to $12,000 annually, without altering the annual premium (by then set at $90, or thirty percent of the annual $300 salary). *See* R.I. Gen. Laws § 36–10–10.1(a). The increase applied both retrospectively (to those already retired in 1987) and prospectively. *See id.* § 36–10–10.1(c).

As a result of this increase, the Rhode Island retirement system no longer qualified as a tax-exempt pension plan under Internal Revenue Code § 401(a) because it was out of compliance with § 415(b), which then limited annual pension benefits to either $10,000 or the retiree's annual pre-retirement compensation, whichever was greater.[1] *See* 26 U.S.C. §§ 401(a), 415(b) (retroactively amended in 1996). Both the General Assembly and the Board appear to have been happily unaware of this problem until 1991, when local journalists

brought it to their—and the Internal Revenue Service's—attention.

The problem was a significant one. If the IRS decided to strictly enforce the § 415(b) limit, then the retirement fund would need to pay taxes on its investment profits for each year in which the plan exceeded § 415 limits. That, in turn, would put more of the burden for financing the state's pension obligations on taxpayers. Individual members of the system could also suffer, since they would be responsible for annual taxes on the value of any non-forfeitable accrued benefits. *See* 6 Mertens, *Law of Federal Income Taxation* § 25B:01, at 25B–7 (Sept.1998) (describing tax consequences for participants in a non-qualified pension plan).

After negotiating with the IRS, the state agreed in early 1994 to pass legislation capping past and present legislative pensions at $10,000. *See* 1994 R.I. Pub. Laws ch. 87 ("Cap Act") (codified at R.I. Gen. Laws § 36–8–20 and § 36–10–10.1). The Cap Act added a new section to the retirement statute to declare the state's general intention "that the retirement system satisfy the requirements of § 401(a) of the Internal Revenue Code." R.I. Gen. Laws § 36–8–20(a). Section 36–8–20 also included a number of specific provisions intended to ensure compliance with Code requirements, including a section providing that "[b]enefits shall not be payable to the extent that they exceed the limitations imposed by § 415 of the code." *Id.* § 36–8–20(f). Another section of the Cap Act explicitly limited legislative pensions to $10,000, effective July 1995:

> If a [retired legislator] is entitled under subsection (a) of this section to an annual retirement allowance which is in excess of the amount permitted by § 415(b)(4) of the Internal Revenue

---

1. Also contributing to the excess benefits problem was a Rhode Island provision granting three percent cost-of-living adjustments annually, since the operation of this provision brought some pensioners' benefits above the limit set by § 415(b). *See R.I. Gen. Laws* § 36–10–35(d).

Code, ... the amount in excess of ten thousand dollars ($10,000):

. . . . .

... [s]hall be paid from the retirement system after June 30, 1995, only to the extent permitted by the limitation on benefits imposed by § 36–8–20[ (f) ] [which in turn permits no benefits in excess of Code § 415].

*Id.* § 36–10–10.1(e)(1). The Cap Act provided further that "[a]ny amount not permitted to be paid by the retirement system ... shall be paid out of general funds, but only to the extent that amounts have been appropriated for those payments." *Id.* § 36–10–10.1(e)(2).[2]

After the General Assembly chose not to appropriate the funds required in 1995 to replace the excess benefits, the Board began reducing monthly payments to each pensioner whose annual benefits exceeded $10,000. The reductions were quite substantial: pensioners who had been receiving the highest pensions (in excess of $18,-000[3]) lost nearly forty-five percent of their benefits, and collectively the reductions for 1995 totaled nearly $700,000.

The plaintiffs, a class of 171 retired legislators or their spouses who had been receiving pensions in excess of $10,000 an-

nually, brought suit against the Board to recover the withheld amounts, naming as additional defendants Nancy Mayer, in her official capacities as Chair of the Board and as Treasurer of Rhode Island, and Joann Flaminio, in her official capacity as Executive Director of the Board. The pensioners alleged that the Cap Act as applied violated the Takings Clause, Contract Clause, and Due Process Clause and that each of the defendants had violated 42 U.S.C. § 1983 by implementing an unconstitutional law.

The pensioners sought a preliminary injunction in July 1995 to prevent the Board from withholding benefits. Their request was denied because the district court—discounting Eleventh Amendment concerns raised by the plaintiffs—found that withholding excess benefits would not cause irreparable harm since the Board could later be ordered to award any wrongly withheld benefits.[4] Plaintiffs chose not to appeal the denial of the preliminary injunction.

A little over a year after the district court's denial of plaintiffs' motion for a preliminary injunction, Congress amended § 415(b) to eliminate, retroactively, the $10,000 cap for government pensions. After some prodding from the plaintiffs, the

---

**2.** Meanwhile, the electorate passed a constitutional amendment that significantly changed Rhode Island's system of legislator compensation. *See* R.I. Const. art. VI, § 3 (approved November 8, 1994). The amendment precluded new legislators from participating in the retirement system after 1994, but also increased legislators' salary from $300 to $10,000. *See id.* The amendment permitted legislators elected prior to 1994 to continue building pension credits, but only if they also chose to forgo the salary increase. *See id.*

**3.** These pensions exceeded the $12,000 maximum set by the 1987 amendment to § 36–10–10.1 because they combined basic benefits under that section with cost of living increases under § 36–10–35(d).

**4.** Chief Judge Ronald R. Lagueux, who heard the preliminary injunction motion, summarized the plaintiffs' concern and his response as follows:

Plaintiffs argue that the Court must grant preliminary relief at this time because if the plaintiffs are not paid this additional amount, the Eleventh Amendment will bar the Court in the future from ordering that this amount be paid to them. I don't think the Eleventh Amendment is a bar to the Court's power to order, in effect, complete restitution in the future. If the Court finds that this statute violates the Federal Constitution, then the Court can fashion an appropriate remedy. It is not a case of awarding damages. It is a case of mandating that the State comply with its constitutional obligations.

Transcript of Preliminary Injunction Hearing, Rhode Island District Court, July 26, 1995, before Chief Judge Ronald R. Lagueux. Again, we express no opinion on the Eleventh Amendment issues presented by this case. For further discussion of the complexity of these issues, see note 6 below.

Board responded by refunding all of the excess benefits that had been withheld since the Cap Act took effect approximately fifteen months before (totaling nearly $850,000). It did not refund any interest earned during the time the money was withheld.

The plaintiffs proceeded with their suit, seeking to recover the missing interest as well as attorneys' fees under § 1988. On cross-motions for summary judgment, the district court (McAuliffe, J.) held that the Cap Act had violated the Takings Clause and that the Board had violated § 1983 by temporarily withholding benefits pursuant to the Act. It found, furthermore, that the Board was not entitled to Eleventh Amendment immunity. Thus, it denied the defendants' motion for summary judgment, granted summary judgment to the plaintiffs, and awarded plaintiffs $31,862.83 in "prejudgment interest" under § 1983 and $133,098.50 in costs and attorneys' fees under § 1988. The Board and Nancy Mayer, in her official capacity as Treasurer of Rhode Island, appeal on numerous grounds.

## II

We review the district court's grant of summary judgment *de novo*. *See Lennon v. Rubin*, 166 F.3d 6, 8 (1st Cir.1999). Out of the mass of issues presented by this appeal, our first question is to decide the order in which the issues must be decided.

■ The most obvious of the "order" questions is whether we must address defendants' Eleventh Amendment arguments before considering the merits of the plaintiffs' § 1983 claims. Under this circuit's practice, we have considered it permissible to defer an Eleventh Amendment question until after the merits were addressed, thus avoiding the Eleventh Amendment question entirely if plaintiffs lost on the merits. *See, e.g., Mercado–Boneta v. Administracion del Fondo de Compensacion Al Paciente*, 125 F.3d 9, 11–12 (1st Cir.1997) (pretermitting "resolution of th[e] [Elev-

enth Amendment] jurisdictional issue"); *Willhauck v. Halpin*, 953 F.2d 689, 713 n. 24 (1st Cir.1991) (noting that jurisdiction may be assumed in the face of an Eleventh Amendment challenge).

But the Supreme Court recently declared that courts should generally determine whether Article III jurisdiction exists before reaching the merits of a plaintiff's claim. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, ——–——, 118 S.Ct. 1003, 1012–16, 140 L.Ed.2d 210 (1998). If *Steel Co.*'s rejection of "the doctrine of hypothetical jurisdiction," *id.* at ——, 118 S.Ct. at 1012 (internal quotation marks omitted), extends to the type of hypothetical jurisdiction approved in *Mercado–Boneta* and *Willhauck*, then we would be obligated to decide whether the Board can claim Eleventh Amendment immunity before deciding whether the Board's actions deprived plaintiffs of their federal constitutional rights.

Before discussing the boundaries of the *Steel Co.* rule, we pause to underline the fact that the rule does not appear to be an absolute one. While a majority of justices rejected the use of "hypothetical jurisdiction" under the facts presented, *see id.* at ——–——, 118 S.Ct. at 1012–16, only three justices (Chief Justice Rehnquist along with Justices Scalia and Thomas) treated this outcome as inevitable. Justice O'Connor, along with Justice Kennedy, joined the Court's opinion but wrote separately to emphasize that "several of [the Court's] decisions have diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question" and to explain that "the Court's opinion should not be read as cataloging an exhaustive list of circumstances under which federal courts may exercise judgment in reserv[ing] difficult questions of ... jurisdiction." *Id.* at ——, 118 S.Ct. at 1020 (O'Connor, J., concurring) (alterations in original) (internal quotation marks omitted). Justice Breyer agreed that, although Article III questions "typically" should be decided first, "[t]he Constitution does not

impose a rigid judicial 'order of operations.'" *Id.* at ——–——, 118 S.Ct. at 1020–21 (Breyer, J., concurring in part and concurring in the judgment). The remaining three justices found it unnecessary under the facts of *Steel Co.* to consider Article III jurisdiction before reaching other issues. *See id.* at ——–——, 118 S.Ct. at 1021–32 (Stevens, J., concurring in the judgment, joined in part by Souter & Ginsburg, JJ.); *id.* at ——, 118 S.Ct. at 1032 (Ginsburg, J., concurring in the judgment). Thus, "[t]he various opinions in the case, read as a whole, are not entirely clear as to whether (or to what extent) *Steel Co.* undermines our earlier practice [of bypassing jurisdictional issues]." *Hardemon v. City of Boston,* 144 F.3d 24, 26 (1st Cir. 1998).

It is also important to note the Court's narrow use of the term "jurisdiction" in *Steel Co.* The decision in *Steel Co.* distinguishes between Article III jurisdiction questions and statutory jurisdiction questions, holding that the former should ordinarily be decided before the merits, but the latter need not be. *See Steel Co.,* 523 U.S. at ——–——, 118 S.Ct. at 1009–16. Thus, the issue is whether Eleventh Amendment questions should be treated as Article III jurisdiction questions for the purposes of *Steel Co.* This is a puzzle with a long pedigree. *See Wisconsin Dep't of Corrections v. Schacht,* 524 U.S. 381, ——, 118 S.Ct. 2047, 2054, 141 L.Ed.2d 364 (1998) (noting that the Supreme Court has never resolved whether, or to what extent, "Eleventh Amendment immunity is a matter of subject matter jurisdiction"). *See generally* Chemerinsky, *Federal Jurisdiction* § 7.3 (2d ed.1994) (discussing the history of competing theories of the nature of the Eleventh Amendment).

■ In some ways the Eleventh Amendment clearly represents a limitation of Article III judicial power. The Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to [certain suits against states]." U.S. Const. amend. XI. The Supreme

Court has concluded from this language that "[t]he Eleventh Amendment restricts the judicial power under Article III." *Seminole Tribe v. Florida,* 517 U.S. 44, 72–73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *see also Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) ("[T]he fundamental principle of sovereign immunity [under the Eleventh Amendment] limits the grant of authority in Article III." ). Two further aspects of Eleventh Amendment doctrine are in harmony with this characterization. First, an Eleventh Amendment argument can be raised for the first time on appeal. *See Edelman v. Jordan,* 415 U.S. 651, 677–78, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Second, Eleventh Amendment questions can be introduced sua sponte by the court. *See, e.g., Sullivan v. Barnett,* 139 F.3d 158, 179 (3d Cir.1998) (collecting cases), *rev'd on other grounds sub nom. American Mfrs. Mut. Ins. Co. v. Sullivan,* —— U.S. ——, 119 S.Ct. 977, —— L.Ed.2d —— (1999); *V–1 Oil Co. v. Utah State Dep't of Pub. Safety,* 131 F.3d 1415, 1419–20 (10th Cir.1997); *Atlantic Healthcare Benefits Trust v. Googins,* 2 F.3d 1, 4 (2d Cir.1993).

Because Eleventh Amendment issues are clearly linked to the question of Article III jurisdiction, some courts have held that *Steel Co.* requires them to address Eleventh Amendment questions before reaching the merits of a plaintiff's claim. *See, e.g., Seaborn v. Florida Dep't of Corrections,* 143 F.3d 1405, 1407 (11th Cir.1998) ("[A]n assertion of Eleventh Amendment immunity must be resolved before a court may address the merits of the underlying claim(s).") (citing *Steel Co.,* 523 U.S. at ——–——, 118 S.Ct. at 1012–16; *Kilcullen v. New York State Dep't of Transp.,* 33 F.Supp.2d 133, 136 (N.D.N.Y.1999) (same); *Johnson v. State Technology Center,* 24 F.Supp.2d 833, 837 (W.D.Tenn.1998) (same) (citing *Steel Co.,* 523 U.S. at ——–——, 118 S.Ct. at 1012–16, and *Seaborn,* 143 F.3d at 1406).

■ But the nature of the Eleventh Amendment is more complex than these

decisions acknowledge. Although Eleventh Amendment questions are often labeled "jurisdictional," *see, e.g., Mercado–Boneta,* 125 F.3d at 12, the Amendment differs in several crucial ways from ordinary restrictions on subject matter jurisdiction. For one, Eleventh Amendment immunity can be waived. *See Schacht,* 524 U.S. at ——, 118 S.Ct. at 2052 (citing *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), and *Clark v. Barnard,* 108 U.S. 436, 447, 2 S.Ct. 878, 27 L.Ed. 780 (1883)); *see also Toll v. Moreno,* 458 U.S. 1, 17–19, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982) (recognizing state's ability to waive Eleventh Amendment immunity by its actions in a particular case).[5] Furthermore, while courts have the discretion to raise Eleventh Amendment questions sua sponte, Article III does not obligate them to do so. *See Schacht,* 524 U.S. at —— – ——, 118 S.Ct. at 2052–53 (citing *Patsy v. Board of Regents of Fla.,* 457 U.S. 496, 515 n. 19, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982)). These two aspects of Eleventh Amendment doctrine suggest that the Eleventh Amendment is just as much a grant of immunity (i.e., a type of defense) as it is a limitation on courts' jurisdiction. *See id.* at ——, 118 S.Ct. at 2055 (Kennedy, J., concurring) ("[O]ur precedents have treated the Eleventh Amendment as 'enact[ing] a sovereign immunity from suit, rather than a nonwaivable limit on the federal judiciary's subject-matter jurisdiction.'" (quoting *Idaho v. Coeur d'Alene Tribe,* 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997))).

This suggests, in turn, that Eleventh Amendment issues do not fall into the category of Article III questions that *Steel Co.* would define as necessarily antecedent. At least one Supreme Court decision seems to support this conclusion. In *Calderon v. Ashmus,* 523 U.S. 740, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998), the Court considered whether an inmate's declaratory judgment action presented an Article III "case or controversy." The Court observed that it needed to address this question of justiciability before it could reach the parties' Eleventh Amendment and First Amendment arguments, and then explained in a footnote that "[w]hile the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power, ... it is not co-extensive with the limitations on judicial power in Article III." *Id.* at —— & n. 2, 118 S.Ct. at 1697 & n. 2. Thus, the Court implied that Eleventh Amendment questions are excluded from the category of Article III issues that must be addressed before the merits. At least one district court has explicitly adopted this rule. *See Bowers v. National Collegiate Athletic Ass'n,* 9 F.Supp.2d 460, 498 n. 15 (D.N.J. 1998).

■ The rule makes sense in light of *Steel Co.*'s underlying rationale. *Steel Co.* rejects the assertion of "hypothetical jurisdiction" where a court's Article III jurisdiction is in doubt, because a court without Article III jurisdiction has no power to declare the law—it would only be in a position to render an advisory opinion, *see Steel Co.,* 523 U.S. at ——, 118 S.Ct. at 1016, which "offends fundamental principles of separation of powers," *id.* at ——, 118 S.Ct. at 1012. Choosing to decide the merits before considering an Eleventh Amendment argument simply does not present the same risk: because Eleventh Amendment immunity can be waived, the presence of an Eleventh Amendment issue does not threaten the court's underlying power to declare the law. If this were not the case, sua sponte consideration of a possible Eleventh Amendment bar would have to be obligatory, not discretionary—but the Supreme Court has now clearly stated that courts are free to ignore possible Eleventh Amendment concerns if a defendant chooses not to press them. *See*

---

**5.** Indeed, in a very recent pension-related Contract Clause case in this court, Rhode Island did not raise the Eleventh Amendment. *See NEA,* 172 F.3d 22.

*Schacht*, 524 U.S. at ——–——, 118 S.Ct. at 2052–53.

It seems to us that the relevant maxim in the Eleventh Amendment context is not that federal courts cannot act without first establishing their jurisdiction, but rather that courts should "not reach constitutional questions in advance of the necessity of deciding them." *American Mfrs. Mut. Ins. Co. v. Sullivan*, —— U.S. ——, ——, 119 S.Ct. 977, 991, 143 L.Ed.2d 130 (1999) (Ginsburg, J., concurring in part and concurring in the judgment) (quoting *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, P.C.*, 467 U.S. 138, 157, 104 S.Ct. 2267, 81 L.Ed.2d 113 (1984)) (internal quotation marks omitted); *see also Maine Green Party v. Maine, Secretary of State*, 173 F.3d 1, 5 (1st Cir.1999) (applying "the presumption towards decisional minimalism").

**6.** The case before us illustrates nicely just how much squandering might occur. The facts here present the typically difficult question whether the defendant Board is an "arm of state." *See Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Auth.*, 991 F.2d 935, 939–40 (1st Cir.1993) (outlining multi-factor, fact-intensive "arm of state" test). But they also present an even more difficult question regarding the nature of plaintiffs' requested remedy.

Generally, plaintiffs are barred by the Eleventh Amendment from seeking purely retrospective remedies; awards against the state must be at least partially prospective. A long line of cases has purported to apply this distinction. *See, e.g., Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 269–70, 281–88, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *id.* at 288–97, 117 S.Ct. 2028 (O'Connor, J., concurring in part and concurring in the judgment); *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985); *Quern v. Jordan*, 440 U.S. 332, 346–49, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Edelman v. Jordan*, 415 U.S. 651, 664–71, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Ex parte Young*, 209 U.S. 123, 155–68, 28 S.Ct. 441, 52 L.Ed. 714 (1908). But the distinction is notoriously slippery, *see generally* Vazquez, *Night and Day:* Coeur d'Alene, Breard, *and the Unraveling of the Prospective–Retrospective Distinction in Eleventh Amendment Doctrine*, 87 Geo. L.J. 1 (1998), and it has only become more so since the Supreme Court firmly established in *First English Evangelical Lutheran Church v. Coun-*

■ Abiding by this "fundamental rule of judicial restraint," *American Mfrs. Mut. Ins. Co.*, —— U.S. at ——, 119 S.Ct. at 991 (Ginsburg, J., concurring) (internal quotation marks omitted), and thus avoiding Eleventh Amendment questions where there are other dispositive issues, produces two positive outcomes. First, it permits courts to avoid squandering judicial resources.[6] Second, and more important, it avoids forcing defendants to expend their resources on Eleventh Amendment questions in situations in which they would rather not do so. The point is made by supposing that a particular case presents an easy merits issue (favoring the defendant) and a difficult Eleventh Amendment issue. If the Eleventh Amendment issue had to be addressed first under *Steel Co.*, then the defendant would have to focus on that issue in order to avoid setting unwant-

*ty of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), that the Takings Clause also requires just compensation for temporary takings (which would seem to be irreducibly retrospective).

Some courts and commentators have escaped this logical circle by concluding that the Eleventh Amendment is not a bar to the recovery of just compensation for temporary takings. *See, e.g., Unix System Laboratories, Inc. v. Berkeley Software Design, Inc.*, 832 F.Supp. 790, 803–04 (D.N.J.1993) (assuming, in "the spirit of *First English*," that the Eleventh Amendment does not bar plaintiffs' takings claims); *Esposito v. South Carolina Coastal Council*, 939 F.2d 165, 173 n. 3 (4th Cir.1991) (Hall, J., dissenting) (arguing that "the Eleventh Amendment's general bar of damages against states must yield" in the face of *First English*); Fallon & Meltzer, *New Law, Non–Retroactivity, and Constitutional Remedies*, 104 Harv. L.Rev. 1731, 1825 (1991) (citing *First English* for the proposition that the Eleventh Amendment bar against a compensatory remedy does not apply to Takings Clause claims).

This possibility leads to a circular result. If we were forced under *Steel Co.* to address the Eleventh Amendment question first, we would need to consider the merits of the plaintiffs' claims in great detail (particularly their Takings Clause claim, which is, in turn, dependent on their Contract Clause claim) in order to answer the supposedly prior question of Eleventh Amendment immunity.

ed precedent[7]—even though, in the end, the Eleventh Amendment issue was not necessary to the court's decision.

The application of the *Steel Co.* rule to Eleventh Amendment questions would mean that courts were required, under certain circumstances, to begin their opinions with the equivalent of "obligatory dicta." We decline to create such a rule.[8]

## III

■ Another question in this case, however, does fall more squarely under the *Steel Co.* rule. Before we address any other issue, we address defendants' argument that plaintiffs' claims became moot when the Board refunded the withheld benefits in 1996. If plaintiffs' claims were rendered moot, there would no longer be any case or controversy, and we would therefore lack Article III jurisdiction. *See SEC v. Medical Comm. for Human Rights,* 404 U.S. 403, 407, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972) (relating the mootness doctrine to the Article III "case or controversy" requirement).

■ After their benefits were refunded, plaintiffs continued to press two claims: (1) a claim for interest on the benefits (or, alternatively, damages for the delay in payment), and (2) a claim for attorneys' fees under § 1988. We conclude that plaintiffs adequately pled and argued (albeit somewhat skeletally) a claim for interest that was not rendered moot by the Board's refund of the withheld benefits because it rests on an independent constitutional basis.[9] They present three possibilities. First, plaintiffs assert that they have a specific contractual right protected by the Contract Clause, not only to continue receiving benefits above $10,000, but also to receive interest on those benefits if payment of the benefits is delayed. Alternatively, assuming that there was a Contract Clause right to the withheld benefits, plaintiffs also assert that this contractual "property" has been "taken" under the Takings Clause, *see Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1003, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (noting that valid contracts are property within the meaning of the Takings Clause), and that the payment of interest would constitute just compensation for that taking, *see Jacobs v. United States,* 290 U.S. 13, 16–17, 54 S.Ct. 26, 78 L.Ed. 142 (1933) (holding that interest is a part of the "just compensation" that is the constitutionally compelled remedy for a Takings Clause violation). Finally, plaintiffs assert that the Board's refusal to pay interest on the withheld benefits also constitutes a direct Takings Clause violation under *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). *See id.* at 321–22, 107 S.Ct. 2378 (holding that just compensation is required for temporary regulatory takings). Since the possibility of even a partial remedy is sufficient to prevent a case from being moot, *see Calderon v. Moore,* 518 U.S. 149, 150, 116 S.Ct. 2066, 135 L.Ed.2d 453 (1996), we proceed to the merits.

## IV

Plaintiffs originally alleged violations of the Takings Clause, the Contract Clause,

---

7. Alternatively, the defendant would be forced to waive immunity—itself an unappealing option, given the risk that, contrary to expectations, the court could decide for the plaintiff on the merits.

8. By contrast, the *Steel Co.* rule would be applicable in diversity suits where the existence of Article III jurisdiction depends on the quasi-factual question whether a party is an "alter ego" or "arm of the state." *See, e.g., University of Rhode Island v. A.W. Chesterton Co.,* 2 F.3d 1200, 1202–17 (1st Cir.1993) (deciding that the University of Rhode Island is not an "alter ego" or "arm of the state" in order to determine its citizenship for purposes of diversity jurisdiction).

9. Thus, we do not reach the question whether a claim for attorneys' fees or for a discretionary award of prejudgment interest under § 1983 are themselves enough to avoid mootness after the main claim has become moot.

and the Due Process Clause. The district court granted summary judgment in favor of the plaintiffs on the Takings Clause claim and did not reach the other two claims. On appeal, plaintiffs have abandoned their Due Process claim but continue to press the other two. Accordingly, we must decide if the Takings Clause, the Contract Clause, or both have been violated.

Both courts and parties have sometimes treated Takings, Contract, and Due Process claims as if they were interchangeable. This is understandable, given that all three clauses serve to cabin, on some level, states' ability to act retroactively. But other recent decisions suggest that when faced with multiple, potentially relevant constitutional provisions, courts should invoke the provision that treats most directly the right asserted. *See, e.g., Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (refusing to apply "the more generalized notion of 'substantive due process'" on the ground that "the Fourth Amendment provides an explicit textual source of constitutional protection against th[e] sort of ... conduct [complained of]"); *Armendariz v. Penman,* 75 F.3d 1311, 1324 (9th Cir.1996) (en banc) (concluding, based on the reasoning in *Graham,* that "private takings" can be addressed only under the Takings Clause, not the Due Process Clause).

▮ Our analysis of the boundaries of the Contract and Takings Clauses is guided more specifically by the Supreme Court's most recent Takings Clause case, which was decided after the district court granted summary judgment here. *See Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). Read as a whole, the various opinions in *Eastern Enterprises* make clear that plaintiffs must first establish an independent property right before they can argue that the state has taken that right without just compensation. Five justices in *Eastern Enterprises* found that a federal law requiring coal producers to provide lifelong health care benefits to ex-employees violated the Constitution because it imposed "severe retroactive liability" that was "disproportionate to the parties' experience" on "a limited class of parties that could not have anticipated th[at] liability." *Id.* at ——, 118 S.Ct. at 2149; *see also id.* at —— – ——, 118 S.Ct. at 2137–60. But only four justices found a Takings Clause violation. Justice Kennedy wrote separately to explain why he found takings analysis inapposite, and why the Due Process Clause provided the proper framework for analysis of the coal producers' claim. *See id.* at —— – ——, 118 S.Ct. at 2154–60 (Kennedy, J., concurring in the judgment and dissenting in part) (emphasizing "the importance [to Takings Clause analysis] of identifying the property allegedly taken, lest all governmental action be subjected to examination under [the Takings Clause]"). The four dissenters agreed with Kennedy on this point (while disagreeing with the content of his due process analysis). *See id.* at —— – ——, 118 S.Ct. at 2161–63 (Breyer, J., dissenting, joined by Stevens, Souter, & Ginsburg, JJ.). Thus, a majority of justices found that the Takings Clause did not apply under the facts of *Eastern Enterprises,* because they concluded that a Takings Clause issue can arise only after a plaintiff's property right has been independently established. *See id.* at —— – ——, 118 S.Ct. at 2154–58 (Kennedy, J., concurring in the judgment and dissenting in part); *id.* at —— – ——, 118 S.Ct. at 2161–63 (Breyer, J., dissenting).

▮ It is clear that this case does not involve tangible personal property or real property. It does not involve an effort to reclaim benefits already paid. The only property interest alleged is an expectancy interest claimed to derive from a contract between the state and the plaintiffs to afford a certain level of pension benefits. The facts here require us to consider whether plaintiffs had the requisite property right to support a Takings Clause claim by analyzing their claim under the

Contract Clause. *See NEA*, 172 F.3d at 29–30 (denying a Takings Clause claim because there was no enforceable contract right); *Hoffman v. City of Warwick*, 909 F.2d 608, 616 (1st Cir.1990) (same). Plaintiffs' claim that the Board's refusal to pay interest on the withheld benefits constitutes a direct Takings Clause violation must fail under *Eastern Enterprises*.[10] Only if we determine that plaintiffs had a constitutionally protected contract right to the excess benefits can we consider whether the state took that contract right without just compensation.

## V

The Contract Clause provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Although the original intent of this language was to bar retroactive laws (particularly debtor relief laws) that would impair private contractual rights, the clause has long been interpreted to apply to public contracts as well. *See, e.g., Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 137–39, 3 L.Ed. 162 (1810).

▮ The same two-part test applies in both public and private contexts. *See Parker v. Wakelin*, 123 F.3d 1, 4–5 (1st Cir.1997); *McGrath v. Rhode Island Retirement Bd.*, 88 F.3d 12, 16 (1st Cir.1996). A reviewing court must first decide whether a change in state law has resulted in the "substantial impairment of a contractual relationship." *General Motors Corp. v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S.

234, 244, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978)) (internal quotation marks omitted); *see also Parker*, 123 F.3d at 4–5. This question can be broken down into "three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Romein*, 503 U.S. at 196, 112 S.Ct. 1105; *see also Parker*, 123 F.3d at 5; *McGrath*, 88 F.3d at 16. If each of these three component questions is answered affirmatively, the court must determine whether the impairment is nonetheless justified as "reasonable and necessary to serve an important public purpose." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 25, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); *see also Parker*, 123 F.3d at 5; *McGrath*, 88 F.3d at 16.

▮ The height of the hurdles plaintiffs must overcome under each part of this test, however, depends on whether the context is public or private. Where the state is alleged to have impaired private contractual rights, the hurdle for plaintiffs under the second part of the test will ordinarily be higher than in public contract cases, since states have broad discretion to determine whether an impairment of a private contract is reasonable or necessary. *See id.* at 25–26, 97 S.Ct. 1505; *Parker*, 123 F.3d at 5. But where the state is alleged to have impaired a public contract, at least where the impairment operates for the state's benefit, "less deference to a legislative determination of reasonableness and necessity is required, because 'the State's self-interest is at stake.' "

---

**10.** The facts here should be compared with those in *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998) and *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980). The plaintiffs in *Phillips* and *Webb's*, like plaintiffs here, alleged that defendants had taken interest without just compensation, but defendants in those cases did not challenge plaintiffs' right to the underlying principal. *See Phillips*, 524 U.S. at ——, 118 S.Ct. at 1930; *Webb's*, 449 U.S. at 155–56, 101 S.Ct. 446.

Here, plaintiffs have the burden of proving that they had a constitutional right both to the principal (i.e., the withheld benefits) and to the interest on that principal. They may attempt to do so by showing that they have a specific contractual right for the purposes of the Contract Clause both to the withheld benefits and to interest on those benefits, or by showing that they have a contract right to the benefits and a right under the Takings Clause to receive interest as just compensation for the temporary taking of those benefits.

*Parker,* 123 F.3d at 5 (quoting *United States Trust Co.,* 431 U.S. at 26, 97 S.Ct. 1505); *see also McGrath,* 88 F.3d at 16 ("[W]hen a state is itself a party to a contract, courts must scrutinize the state's asserted purpose with an extra measure of vigilance.").

 By contrast, where a public contract allegedly arises out of statutory language, the hurdle under the first component of the first part of the test—proving that a contractual relationship exists—is necessarily higher, since "normally state statutory enactments do not of their own force create a contract with those whom the statute benefits." *Hoffman,* 909 F.2d at 614. Indeed, "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights.'" *National R.R. Passenger Corp. v. Atchinson, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 465–66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) (quoting *Dodge v. Board of Educ.,* 302 U.S. 74, 79, 58 S.Ct. 98, 82 L.Ed. 57 (1937)).

 Finding a public contractual obligation has considerable effect. It means that a subsequent legislature is not free to significantly impair that obligation for merely rational reasons. Because of this constraint on subsequent legislatures, and thus on subsequent decisions by those who represent the public, there is, for the purposes of the Contract Clause, a higher burden to establish that a contractual obligation has been created. For similar reasons, this issue is one of federal, not state law. *See Dodge v. Board of Educ.,* 302 U.S. 74, 79, 58 S.Ct. 98, 82 L.Ed. 57 (1937).

 To overcome this presumption, plaintiffs here must show that the legislature "clearly and unequivocally" intended to grant them a contractual right to annual pension benefits in excess of $10,000. *National R.R.,* 470 U.S. at 466, 105 S.Ct. 1441. Statutory language, standing alone, may evince such an intent if it expressly authorizes a contract or expressly states that benefits are contractual. *See, e.g., United States Trust Co.,* 431 U.S. at 18, 97 S.Ct. 1505 (deriving clear intent to contract from the use of the phrase "covenant and agree"); *Indiana ex rel. Anderson v. Brand,* 303 U.S. 95, 105, 58 S.Ct. 443, 82 L.Ed. 685 (1938) (holding that a statute's repeated use of the label "contract" demonstrated legislative intent to create a binding and enforceable obligation). A statutory provision can also evince an unmistakable intent to contract if it expressly bars future amendments that would reduce benefits already granted. *See, e.g., Parker,* 123 F.3d at 8–9 (describing anti-retroactivity provision in Maine pension law); *see also id.* at 7 (noting that several state constitutions contain similar provisions barring reductions in accrued benefits of public employees).

 In *NEA,* this court examined the Rhode Island retirement system and concluded that the language of the state's retirement statute, standing alone, fails to demonstrate such a "clear and unequivocal" intent to contract. *See NEA,* 172 F.3d at 27–29. "Nowhere does the statute call the pension plan a 'contract' or contain an anti-retroactivity clause as to future changes." *Id.* at 27. The statute does state that "it is the intention of the state to make payment of the benefits ... provided for ... [and] to make the appropriations required ... to meet its obligations to the extent provided." R.I. Gen. Laws § 36–10–7. However, while this provision "directs state officials to fund the plan as it exists," it "falls at least a step short of clearly expressing a contractual commitment not to change benefit levels or other plan variables by legislation." *NEA,* 172 F.3d at 27. The statute's use of the term "vesting" is similarly inconclusive, since the concepts of a vested right and a contractual right are not coextensive. *See id.* at 28–29. *NEA*'s evaluation of the language of the statute as a whole encompasses the specific language at issue here. Nothing in § 36–10–10.1(a)—which provides that retired legislators "shall be enti-

tled to receive ... an annual sum of six hundred dollars ($600) for each year of total service ... [up to] twelve thousand dollars ($12,000) annually"—rises to the level of an express contractual promise to provide benefits, or to provide benefits above $10,000.

But our analysis cannot end with the bare language of the statute, since a clear and unequivocal intent to contract can also be demonstrated by circumstances. *See United States Trust Co.,* 431 U.S. at 18 n. 14, 97 S.Ct. 1505; *NEA,* 172 F.3d at 28–29. Such circumstances, by their nature, will vary from case to case. Particular plaintiffs bringing particular Contract Clause claims based upon the Rhode Island pension statute may find themselves in markedly different circumstances. In *NEA,* for example, plaintiffs were teachers' union officials who were first permitted to "buy in" to the state employee pension system at attractive rates, then quickly evicted again after the legislature determined that their inclusion had no rational relationship to any legitimate government purpose and would in any case threaten the system's tax-exempt status. *See* R.I. Gen. Laws § 36–9.1–1 *et seq.* ("Eviction Act"); *NEA,* 172 F.3d at 24–25. This court concluded from these circumstances that the legislature did not "clearly and unequivocally" intend to grant union officials a contractual right to future payments by the state. *See NEA,* 172 F.3d at 28–29.[11]

In *NEA,* we contrasted the plaintiffs' claim with a hypothetical claim brought by "quintessential 10 or 28–years–of–service government employees" whose pension benefits had been radically reduced. *Id.* Without deciding the question, we noted that such circumstances presented a very different Contract Clause claim. The hypothetical plaintiffs' status as employees of the state, the general trend toward recognizing retirement benefits as contractual, *see Parker,* 123 F.3d at 6–7; *McGrath,* 88 F.3d at 16–17, and certain Rhode Island decisions rejecting the notion that public pensions are gratuities, *see, e.g., In re Almeida,* 611 A.2d 1375, 1385 (R.I.1992), could all serve as evidence that the state intended its pension promises to be binding and enforceable.

But the circumstances here do not closely resemble these hypothetical circumstances. On the contrary, they bear a far greater resemblance to the circumstances at issue in *NEA.* Several facts are particularly relevant. First, plaintiffs do not stand in a classic employer-employee relationship with the state. A legislator's relationship to the state is different in many respects from that of a teacher, a tax collector, or other ordinary public employees. The token salary received by Rhode Island legislators until 1995—a five dollar per diem, up to a maximum of three hundred dollars per year—demonstrates that Rhode Island legislators in particular were not ordinary full-time employees. Indeed, they could hardly afford to be. Instead, they served as part-time, "citizen" legislators. *See National Ass'n of Soc. Workers v. Harwood,* 69 F.3d 622, 637 (1st Cir.1995) (Lynch, J., dissenting) (describing Rhode Island's part-time legislature). Their initial exclusion from the retirement system, their subsequent admission as voluntary, not mandatory, members, and their recent eviction, *see* R.I. Const. art. VI, § 3 (barring legislators elected after 1994 from participating in the retirement system), all reflect their special status.[12]

---

**11.** There can be no claim that the possibility held out in the Cap Act of paying the excess benefits out of appropriations was itself a contract. The language of § 36–10–10.1(e)(2) makes it clear such payments were warranted "only to the extent that amounts have been appropriated for such payments."

**12.** We note but do not rely on the fact that legislators, unlike ordinary public employees, are uniquely well positioned to enact legislation that explicitly provides for contractual protection. This suggests that the "clear and unequivocal" doctrine may have particular force where legislators are claiming a federally protectable contract interest.

Second, the context of the enactment of the legislation suggests that the state could not have intended to create a binding contractual obligation to pay benefits at the levels set by the 1987 law. Throughout, the state's intention appears to have been to maintain a qualified tax-exempt pension. The state's quick reaction to the excess-benefits problem, once it became aware of it, demonstrates this intention, which was also stated expressly in the Cap Act itself. *See* R.I. Gen. Laws § 36–10–10.1(e)(1) (limiting benefits funded by "the retirement system" to those "permitted by § 415(b)(4) of the Internal Revenue Code"). The state's intent to have a qualified plan is also demonstrated by the Eviction Act considered in *NEA,* since an express ground for evicting union officials from the retirement system was the fact that the federal tax code denies qualified status to plans with non-employee members. *See id.* § 36–9.1–1 (tying eviction to § 401(a) of the Code, which bars qualified plans from admitting non-employees).

Finally, the 1987 law raising the maximum legislative benefit to $12,000 was passed shortly after, and apparently in response to, the Rhode Island voters' rejection of a constitutional amendment that would have increased legislators' annual compensation. The results had none of the indicia of a true pension. The increased benefits awarded to legislators who had already retired did not represent bargained-for consideration for service, since these legislators' service was already concluded.[13] Nor could the increased benefits offered to those who had not yet retired be considered bargained-for pension benefits, since they destroyed the qualified status of the retirement system, thus exposing legislators to possible tax liability for the value of their accrued benefits.[14]

We hold that the plaintiffs' claim fails to pass the first component of the first part of the Contract Clause test—proving the existence of a contractual relationship. Neither the language of the retirement statute nor plaintiffs' particular circumstances evince a clear and unequivocal intent on the part of the state to grant the plaintiffs a contractual right to benefits exceeding $10,000. The excess pension benefits eliminated by the Cap Act were ordinary, "gratuitous" government benefits, which the legislature was free to eliminate once it became clear that these benefits threatened the tax-exempt status of the state's retirement system.

Furthermore, because the plaintiffs have failed to establish a contractual right to the withheld benefits, they cannot show that the Board took their "property" when it withheld the benefits pursuant to the Cap Act. Under *Eastern Enterprises,* this showing is the first part of the Takings Clause test. We hold that plaintiffs' claim fails to pass it.

## VI

Because the Board could withhold the excess benefits without depriving plaintiffs of their constitutional rights, we reverse the district court's grant of summary judgment. Our holding strips plaintiffs of their status as prevailing parties, *see* 42 U.S.C. § 1988(b); *see also Farrar v. Hobby,* 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (defining "prevailing party"); thus, we also vacate the district

---

**13.** The members of this group, who in some senses received a windfall, make up the vast majority of the plaintiffs (113 of the 171 retirees).

**14.** Although we need not pursue the argument here, we note that the disastrousness of these results could support a common law mutual mistake argument: both parties to the 1987 "agreement" (the legislators as representatives of the state and the legislators as recipients of the benefits) appear to have been under the mistaken impression that the generous benefits awarded by the law would not destroy the qualified status of the retirement system. *See* Restatement (Second) of Contracts § 152 (listing requirements for avoidance on grounds of mutual mistake).

court's award of costs and attorneys' fees under § 1988.

The denial of a motion for summary judgment is ordinarily not a final, appealable order. However, an appellate court has jurisdiction to review an order denying a motion for summary judgment where that order is coupled with an order granting an opponent's motion for summary judgment. *See* 28 U.S.C. § 1291; 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2715, at 268 (3d ed. 1998) ("[In this situation,] it has been held that ... both decisions are immediately appealable."). Because we conclude in light of the undisputed facts that the defendants are entitled to judgment as a matter of law, we remand to the district court for entry of summary judgment in their favor.

So ordered. No costs are awarded.