

2003 Decisions

8-20-2003

# Bowers v. Natl Collegiate

Precedential or Non-Precedential: Precedential

Docket No. 02-3236P

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Bowers v. Natl Collegiate" (2003). *2003 Decisions.* Paper 291.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/291

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed August 20, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 02-3236, 01-4226, 01-4492, 02-1789

MICHAEL BOWERS

v.

THE NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, as an Association
and a Representative of its Member
Schools a/k/a NCAA; THE NCAA INITIAL-
ELIGIBILITY CLEARINGHOUSE; CEDRIC W. DEMPSEY,
Executive Director of the NCAA, in his individual
and official capacities; CALVIN SYMONS, Managing
Director of the NCAA Student-Eligibility Clearinghouse,
in his individual and official capacities; TEMPLE
UNIVERSITY OF THE COMMONWEALTH SYSTEM OF
HIGHER EDUCATION; ACT INC; UNIVERSITY OF IOWA;
AMERICAN INTERNATIONAL COLLEGE;

THE STATE OF NEW JERSEY,

Intervenor-Defendant in District Court

TEMPLE UNIVERSITY OF THE COMMONWEALTH
SYSTEM OF HIGHER EDUCATION,

Defendant/Third-Party Plaintiff

v.

DELAWARE STATE UNIVERSITY;
THE UNIVERSITY OF MEMPHIS;
UNIVERSITY OF MASSACHUSETTS AMHERST,

Third-Party Defendants

University of Massachusetts Amherst
and Delaware State University,

*Appellants in 02-3236*

---

*KATHLEEN BOWERS, administratrix ad
prosequendum of the Estate of
Michael Bowers

v.

THE NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, as an Association
and a Representative of its Member
Schools a/k/a NCAA; THE NCAA INITIAL-
ELIGIBILITY CLEARINGHOUSE;
CEDRIC W. DEMPSEY, Executive Director
of the NCAA, in his individual and
official capacities; CALVIN SYMONS,
Managing Director of the NCAA Student-
Eligibility Clearinghouse, in his
individual and official capacities;
TEMPLE UNIVERSITY OF THE COMMONWEALTH
SYSTEM OF HIGHER EDUCATION; ACT, INC.;
UNIVERSITY OF IOWA; AMERICAN INTERNATIONAL
COLLEGE

THE STATE OF NEW JERSEY,

Intervenor-Defendant in District Court

TEMPLE UNIVERSITY OF THE COMMONWEALTH
SYSTEM OF HIGHER EDUCATION,

Defendant/Third-Party Plaintiff

v.

DELAWARE STATE UNIVERSITY;
THE UNIVERSITY OF MEMPHIS;
UNIVERSITY OF MASSACHUSETTS AMHERST,

Third-Party Defendants

The University of Memphis,

*Appellant in No. 01-4226*

*(Amended Per Clerk's Order of 11/6/02)

---

*KATHLEEN BOWERS, administratrix ad
prosequendum of the Estate of
Michael Bowers

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, as an
Association and a Representative of its Member Schools
a/k/a NCAA; THE NCAA INITIAL-ELIGIBILITY
CLEARINGHOUSE; CEDRIC W. DEMPSEY, Executive
Director of the NCAA, in his individual and official
capacities; CALVIN SYMONS, Managing Director of the
NCAA Student-Eligibility Clearinghouse, in his individual
and official capacities; TEMPLE UNIVERSITY OF THE
COMMONWEALTH SYSTEM OF HIGHER EDUCATION;
ACT, INC.; UNIVERSITY OF IOWA; AMERICAN
INTERNATIONAL COLLEGE;

THE STATE OF NEW JERSEY,

Intervenor-Defendant in District Court

TEMPLE UNIVERSITY OF THE COMMONWEALTH
SYSTEM OF HIGHER EDUCATION,

Defendant/Third-Party Plaintiff

v.

DELAWARE STATE UNIVERSITY;
THE UNIVERSITY OF MEMPHIS;
UNIVERSITY OF MASSACHUSETTS AMHERST,

Third-Party Defendants

University of Iowa,

*Appellant in No. 01-4492*

*(Amended Per Clerk's Order of 11/6/02)

———————

*KATHLEEN BOWERS, administratrix ad
prosequendum of the Estate of
Michael Bowers

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, as an
Association and a Representative of its Member Schools
a/k/a NCAA; THE NCAA INITIAL-ELIGIBILITY
CLEARINGHOUSE; CEDRIC W. DEMPSEY, Executive
Director of the NCAA, in his individual and official
capacities; CALVIN SYMONS, Managing Director of the
NCAA Student-Eligibility Clearinghouse, in his individual
and official capacities; TEMPLE UNIVERSITY OF THE
COMMONWEALTH SYSTEM OF HIGHER EDUCATION;
ACT, INC.; UNIVERSITY OF IOWA; AMERICAN
INTERNATIONAL COLLEGE;

THE STATE OF NEW JERSEY,

Intervenor-Defendant in District Court

TEMPLE UNIVERSITY OF THE COMMONWEALTH
SYSTEM OF HIGHER EDUCATION,

Defendant/Third-Party Plaintiff

v.

DELAWARE STATE UNIVERSITY;
THE UNIVERSITY OF MEMPHIS;
UNIVERSITY OF MASSACHUSETTS AMHERST,

Third-Party Defendants

The University of Massachusetts,

*Appellant in No. 02-1789*

*(Amended Per Clerk's Order of 11/6/02)

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 97-cv-02600)
Honorable Stephen M. Orlofsky, District Judge

_____

Argued July 8, 2003

BEFORE: NYGAARD, SMITH, and GREENBERG,
*Circuit Judges*

(Filed: August 20, 2003)

_____

Richard L. Bazelon (argued)
Bazelon, Less & Feldman
1515 Market Street
7th Floor
Philadelphia, PA 19102

Barbara E. Ransom
Public Interest Law Center
 of Philadelphia
125 South 9th Street
Suite 700
Philadelphia, PA 19107

*Attorneys for Appellees Michael
Bowers and Kathleen Bowers,
administratrix ad prosequendum of
the Estate of Michael Bowers*

Shannon D. Farmer (argued)
Abigail L. Flitter, Esq.
John B. Langel, Esq.
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street
51st Floor
Philadelphia, PA 19103

   *Attorneys for Appellee Temple
   University*

Jack J. Wind
Margulies, Wind, Herrington,
 & Knopf
15 Exchange Place, Suite 510
Jersey City, NJ 07302

Thomas S. Miller
Attorney General
Gordon E. Allen (argued)
Deputy Attorney General
1305 East Walnut Street
Hoover State Office Building,
 2nd Floor
Des Moines, IA 50319

   *Attorneys for Appellant University
   of Iowa*

Andrea M. Silkowitz
Office of Attorney General of
 New Jersey
Division of Law
124 Halsey Street
P.O. Box 45029
Newark, NJ 07102

   *Attorney for State of New Jersey*

Ralph F. Boyd, Jr.
Assistant Attorney General
Seth M. Galanter
Sarah E. Harrington (argued)
United States Department of Justice
Civil Rights Division
Appellate Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

   *Attorneys for Intervenor United
   States of America*

Michael K. Willison
Dickie, McCamey & Chilcote
One Greentree Centre
Suite 201
Marlton, NJ 08053-3105

   *Attorneys for Appellant Delaware
   State University*

Peter L. Frattarelli
Archer & Greiner
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033

Kae Carpenter Todd
Mary M. Collier (argued)
Assistant Attorney General
Civil Litigation and State
 Services Division
Office of the Attorney General
 of Tennessee
P.O. Box 20207
Nashville, TN 37202

   *Attorneys for Appellant University
   of Memphis*

Linda B. Celauro (argued)
John J. Peirano
Gary S. Prish
Carpenter, Bennett & Morrissey
100 Mulberry Street
Three Gateway Center
Newark, NJ 07102

*Attorneys for Appellant University of Massachusetts*

Thomas C. Hart
Ruprecht, Hart & Weeks
306 Main Street
Millburn, NJ 07041

*Attorneys for American International College*

**OPINION OF THE COURT**

GREENBERG, *Circuit Judge.*

## I. FACTUAL AND PROCEDURAL HISTORY

This matter comes on before this court on appeals by the University of Iowa ("Iowa"), Delaware State University ("Delaware State"), the University of Massachusetts ("UMass"), and the University of Memphis ("Memphis") in an action Michael Bowers brought under Title II of the Americans with Disabilities Act ("ADA") and section 504 of the Rehabilitation Act as well as under the New Jersey Law Against Discrimination ("NJLAD"). Among the appellants, however, Bowers sued only Iowa although he also sued Temple University ("Temple"), which is an appellee and is participating in this appeal, and certain other parties that have been dismissed from the action or are not participating in the appeal. During the course of the proceedings, Michael Bowers has died leading to his mother Kathleen Bowers being substituted for him. Nevertheless, as the parties have done in their briefs, as a matter of convenience we will treat him as the sole appellant in this opinion referring to him as "Bowers".

In determining this matter, we accept as true the facts Bowers alleged in his complaint, as amended, and the facts Temple alleged in its third-party complaint against Memphis, UMass, and Delaware State. Inasmuch as the history of this case is long and complicated, we set forth only the portions necessary for resolution of the appeal.

The case may be said to have its origin in the circumstances that Bowers played football in high school in New Jersey and was interested in obtaining an athletic scholarship at a National Collegiate Athletic Association ("NCAA") Division I or II school. The NCAA is an unincorporated voluntary association of more than 1000 members, a majority of which are public and private four-year colleges. *See Cureton v. NCAA*, 198 F.3d 107, 110 (3d Cir. 1999). In fact, the universities involved on this appeal are NCAA members.

Bowers suffered from a diagnosed learning disability that prevented him from taking several of the secondary school courses the NCAA considers to be core requirements for athletic eligibility and for the award of an athletic scholarship. The complaint and third-party complaint allege that the five universities we have mentioned, *i.e.*, Temple, Iowa, Delaware State, UMass, and Memphis, recruited Bowers for their football programs but that the NCAA Clearinghouse, which determines whether student-athlete prospects meet required education guidelines, determined that he did not meet the requirement that a student take 13 core courses in his secondary school. In 1996, after the universities learned of Bowers's status, they ceased recruiting him.[1]

On May 23, 1997, Bowers filed a complaint alleging that the NCAA, the NCAA Initial Eligibility Clearinghouse, and a number of individual defendants violated, *inter alia*, the ADA and the Rehabilitation Act in their treatment of him. After the district court denied Bowers's motion for preliminary injunctive relief, *Bowers v. NCAA*, 974 F. Supp. 459, 467 (D.N.J. 1997), he amended his complaint to join Temple, Iowa, and American International College as

---

1. Temple accepted Bowers as a regular admission student, but restricted his access to its athletic facilities.

defendants and to add state law claims under the NJLAD. The district court subsequently granted summary judgment in favor of the Clearinghouse and granted in part and denied in part the motions for summary judgment filed by the NCAA, Temple, Iowa, and American International College.[2] *Bowers v. NCAA*, 9 F. Supp. 2d 460 (D.N.J. 1998). Following the district court's disposition of subsequent motions for summary judgment in *Bowers v. NCAA*, 118 F. Supp. 2d 494 (D.N.J. 2000), Temple filed a third-party complaint on November 21, 2000, seeking contribution for any monetary liability it might have to Bowers from Delaware State, UMass, and Memphis. These three universities had not been parties to this litigation and Bowers has not sued any of them.

Subsequently, Bowers moved to add claims against Iowa and on July 3, 2001, the district court granted that motion. *Bowers v. NCAA*, Civ. No. 97-2600, 2001 WL 1772801, at *10 (D.N.J. July 3, 2001). In its opinion, in response to Iowa's contention that the amendment would be futile as it was immune from suit, the court held that Iowa was not an arm of the State of Iowa for Eleventh Amendment purposes and thus it was not immune. *Id.* at * 9. Iowa did not appeal from that order at that time.

All three third-party defendants moved to dismiss the third-party complaint, arguing that neither Title II nor section 504 contemplates an award for contribution and further arguing, in the cases of Memphis and Delaware State, that the Eleventh Amendment applied to them and barred Temple's action against them as the provisions for abrogation and waiver of immunity in the two statutes were unconstitutional. The district court, on November 7, 2001, granted in part and denied in part Memphis's motion, holding that Memphis was an arm of the State of Tennessee for Eleventh Amendment purposes, Temple's contribution claim under the NJLAD against Memphis was barred by the doctrine of sovereign immunity, there is a right of contribution under Title II of the ADA and section 504 of

---

2. A consent agreement and order dismissing the action without prejudice as to American International College was filed on December 3, 2001.

the Rehabilitation Act, Congress validly abrogated Memphis's Eleventh Amendment immunity under Title II of the ADA, and Memphis waived its Eleventh Amendment immunity under the Rehabilitation Act by accepting federal funds. *Bowers v. NCAA*, 171 F. Supp. 2d 389, 397-409 (D.N.J. 2001).

The district court denied with prejudice Delaware State's motion to dismiss Temple's claims for contribution under Title II and section 504 as, unlike Memphis with respect to the State of Tennessee, it did not come forward with evidence demonstrating its relationship to the State of Delaware. *Id.* at 399. The court, however, did not make other dispositive rulings on the Eleventh Amendment issues, though it did invite UMass and Delaware State to submit additional briefing on these issues and granted Temple an opportunity to reply to this briefing.[3] *Id.* at 409. Memphis filed a notice of appeal from the November 7, 2001 order on November 21, 2001, and Iowa filed a notice of appeal from the July 3, 2001 order on December 21, 2001.

On November 21, 2001, UMass filed a motion pursuant to 28 U.S.C. § 1292(b) for a prescribed statement with respect to the district court's ruling that there is a right of contribution under Title II and section 504 of the Rehabilitation Act. Delaware State joined in that motion but Memphis did not. On December 7, 2001, UMass filed supplemental papers in support of its motion to dismiss, addressing the Eleventh Amendment issues, but Delaware State did not file any similar additional papers. On March 6, 2002, the district court granted the motions of UMass and Delaware State for a certified order pursuant to 28

3. The court allowed the additional briefing so that UMass and Delaware State could demonstrate their relationships to their respective states to determine whether they were entitled to sovereign immunity on Temple's claim for contribution on the NJLAD claim. *Bowers*, 171 F. Supp. 2d at 409. We are not clear as to why in view of its denial of Delaware State's motion for dismissal predicated on sovereign immunity on the Title II and section 504 claims by reason of its failure to demonstrate that it was entitled to the benefit of the Eleventh Amendment as an arm of the State of Delaware, the court allowed it to file the supplemental brief on the NJLAD claim.

U.S.C. § 1292(b) with respect to the contribution issues. It also found that UMass was an arm of the State of Massachusetts for Eleventh Amendment purposes, but consistently with its order with respect to Memphis, denied UMass's motion to dismiss Temple's claims against it under section 504 and Title II and dismissed Temple's claims against it under the NJLAD. It also dismissed Temple's claim for contribution under the NJLAD against Delaware State as it declined to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over that claim. *Bowers v. NCAA*, 188 F. Supp. 2d 473, 481-82 (D.N.J. 2002). These dispositions left Temple's claim for contribution under Title II and section 504 alive against all three third-party defendants but eliminated the NJLAD contribution claim from the third-party complaint. The court, however, stayed all proceedings related to the third-party complaint pending resolution of Memphis's appeal. *Id.* at 483.[4]

Iowa now appeals at No. 01-4492 from the district court's order reflecting its finding that it is not an arm of the State of Iowa for Eleventh Amendment purposes and Iowa, Memphis at No. 01-4226, and UMass at No. 02-1789, appeal from the district court's orders reflecting its Eleventh Amendment determinations with respect to the abrogation of and waiver of sovereign immunity. Delaware State did appeal from the district court's order denying its motion to dismiss on Eleventh Amendment grounds but it has dismissed that appeal voluntarily. With our permission UMass and Delaware State appeal at No. 02-3236 from the district court's orders of November 7, 2001, and March 6, 2002, reflecting its conclusion that there is a right to contribution under Title II of the ADA and section 504 of the Rehabilitation Act. On March 19, 2002, the United States filed a notice of intervention pursuant to 28 U.S.C. § 2403(a), advising that it was intervening to argue that Congress validly abrogated the states' Eleventh Amendment immunity under Title II and that states accepting federal funds waived that immunity under the Rehabilitation Act. Thus, the appeals raise significant issues with respect to

---

4. This opinion was the ninth the district court had issued in this case. *See Bowers*, 188 F. Supp. 2d at 477. We do not doubt that there will be more.

Iowa's status under the Eleventh Amendment, the abrogation and waiver of the states' Eleventh Amendment immunity by and pursuant to the ADA and the Rehabilitation Act, and whether there can be a right of contribution under those acts. Preliminarily, however, we address procedural and jurisdictional matters with respect to Iowa and Memphis.

## II.  JURISDICTION AND STANDARD OF REVIEW

Subject to the timeliness issue with respect to Iowa's appeal, we have jurisdiction over the orders denying the appellants Eleventh Amendment immunity under 28 U.S.C. § 1291 as those orders are final for purposes of appeal under the collateral order doctrine. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144, 113 S.Ct. 684, 687 (1993). We have jurisdiction with respect to the contribution issues under 28 U.S.C. § 1292(b). Inasmuch as we are deciding this appeal by resolving questions of law, we are exercising *de novo* review. *See Lavia v. Pa. Dep't of Corrs.*, 224 F.3d 190, 194-95 (3d Cir. 2000).

## III.  DISCUSSION

### A.  TIMELINESS OF IOWA'S APPEAL

We first discuss the timeliness of Iowa's appeal. On December 21, 2001, Iowa filed a notice of appeal stating that it appealed "from the following portions of the Orders and Memoranda of the District Court entered on July 3, 2001 . . . ." Iowa App. at 30. Bowers has moved to dismiss the appeal as being untimely.[5] Clearly, Iowa filed this notice

---

5. The court docketed Iowa's appeal at No. 01-4492. Nevertheless, when Iowa filed its brief it bore the number 01-4226, which was the number the court assigned to Memphis's appeal. Moreover, the cover of the brief recited that the appeal was from the order of November 7, 2001. Of course, that was not correct as Iowa's notice of appeal recited that the appeal was from the order of July 3, 2001, and Iowa was not a party to the November 7, 2001 order. Iowa's procedure with respect to this brief caused Bowers on April 23, 2002, to file a second motion to dismiss the appeal at No. 01-4492. Though we are dismissing Iowa's appeal we are denying Bowers's April 23, 2002 motion because it is not necessary and, in any event, we would not dismiss an appeal merely because the brief on the appeal carried the wrong docket number and its cover incorrectly recited the date of the order being appealed.

after the 30-day deadline prescribed by Fed. R. App. P. 4(a)(1). Iowa appears to recognize that, under *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405 (1988), this time limit is mandatory and jurisdictional, and thus ordinarily its appeal would be untimely. *See* Iowa Br. at 9. It nevertheless argues that we may and should entertain its appeal because the interests of justice and judicial economy dictate that we consider its appeal together with the timely appeal of Memphis which also raises Eleventh Amendment issues.

Memphis filed its notice of appeal on November 21, 2001, appealing from the district court's November 7, 2001 order but Iowa was not a party to that order. Iowa, however, did file its appeal 30 days after Memphis filed its appeal. Fed. R. App. P. 4(a)(3) provides: "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed . . . ." Iowa argues that even though it did not file its appeal within the Rule 4(a)(3) 14-day time limit that rule is a nonmandatory rule of practice so that its late filing date does not require us to dismiss its appeal. Iowa Br. at 10. Although not expressly using the term in its brief, it in effect argues that we may consider its appeal under our "pendent" appellate jurisdiction as it contends that Memphis's notice of appeal "establishes the jurisdiction of the Circuit over the entire case . . . ." *Id.* Thus, it seeks to tie its appeal to that of Memphis for jurisdictional purposes. Bowers, on the other hand, argues that Rule 4(a)(3)'s time limit is mandatory and that our pendent jurisdiction cannot reach so far as to encompass Iowa's appeal.[6] Bowers Br. at 24.

---

6. We are assuming without deciding that if Iowa had appealed from the July 3, 2001 order within the 14-day period measured from November 7, 2001, its appeal would have been timely. We also are assuming without deciding that the July 3, 2001 order was final and appealable under the collateral order doctrine even though it arose in the context of the granting of a motion to amend rather than the denial of a motion to dismiss or for summary judgment, the usual context in which collateral order appeals are taken. We may make these assumptions as we are, in any event, dismissing the appeal.

In *Torres*, the Supreme Court held that omission of one litigant's name in a notice of appeal filed by 15 other appellants required a conclusion that that party had not appealed. The Court stated that "the mandatory nature of the time limits contained in Rule 4 would be vitiated if courts of appeals were permitted to exercise jurisdiction over parties not named in the notice of appeal." *Torres*, 487 U.S. at 315, 108 S.Ct. at 2407-08. The Court quoted the Advisory Committee Note following Rule 3, which states: "Rule 3 and Rule 4 combine to require that a notice of appeal be filed with the clerk of the district court within the time prescribed for taking an appeal. Because the timely filing of a notice of appeal is 'mandatory and jurisdictional,' [citation omitted] compliance with the provisions of those rules is of the utmost importance." *Id.*, 108 S.Ct. at 2408. The Court also stated that, although a court may construe the rules liberally in determining the sufficiency of a party's compliance with them, "it may not waive the jurisdictional requirements of Rules 3 and 4, even for 'good cause shown' under Rule 2, if it finds that they have not been met." *Id.* at 317, 108 S.Ct. at 2409.

Nonetheless, in *United States v. Tabor Court Realty Corp.*, 943 F.2d 335, 344 (3d Cir. 1991), we held that, notwithstanding the broad language of *Torres*, Rule 4(a)(3) is best considered a rule of practice so that compliance with it is not a jurisdictional prerequisite. We further held that "in some cases, the rights of the parties are so closely tied together that an appellate court can render no judgment that would be just without affecting the rights of the parties who did not file notices of appeal." *Id.* Yet, subsequently, in *EF Operating Corp. v. American Buildings*, 993 F.2d 1046, 1049 n.1 (3d Cir. 1993), we noted that the broad language of *Torres* overruled several of our precedents that had held that rules like Rule 4(a)(3) were rules of practice. Without citing *Tabor Court*, we stated that "there is no reason to believe that the specific time requirement of Rule 4(a)(3) is not jurisdictional." *Id.*

Bowers urges us to consider *Tabor Court* to be a pendent appellate jurisdiction case, the holding of which does not withstand the Supreme Court's recent narrow view of that doctrine in *Swint v. Chambers County Commission*, 514

U.S. 35, 115 S.Ct. 1203 (1995). We recently have observed that our discretionary, though narrow, exercise of pendent appellate jurisdiction after *Swint* has been limited to two circumstances: "inextricably intertwined orders or review of the non-appealable order where it is necessary to ensure meaningful review of the appealable order." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 203 (3d Cir. 2001).

Here, however, we have no need to reconcile our precedents. Indisputably, considering the July 3, 2001 order by itself Iowa failed to file a timely appeal. Of course, it was that order that determined that Iowa was not an arm of the State of Iowa for Eleventh Amendment purposes and thus was not entitled to sovereign immunity under the amendment. In the November 7, 2001 order, by contrast, the district court did not make any determinations with respect to Iowa. Moreover, in contrast to its conclusion with respect to the relationship of Iowa to its state, it held that Memphis *was* an arm of the State of Tennessee for Eleventh Amendment purposes, but that Congress validly had abrogated the states' immunity under that amendment in Title II and the State of Tennessee had waived that immunity pursuant to section 504 of the Rehabilitation Act by reason of Memphis having accepted federal funds. Thus, Iowa's argument fails under even the most liberal of the standards enunciated in *Tabor Court* for, as we set forth above, the principles of that case apply only where "the rights of the parties are so closely tied together that an appellate court can render no judgment that would be just without affecting the rights of the parties who did not file notices of appeal."

Moreover, *DuPont* suggests that the exercise of pendent appellate jurisdiction requires, at the very least, that the orders from which the appeals are taken be "inextricably intertwined."[7] The July 3 and November 7 orders are not

---

7. The Supreme Court's decision in *Swint* suggests that a court should exercise pendent appellate jurisdiction with particular restraint where an appellant invokes pendent-party rather than pendent-issue jurisdiction. *See* Charles A. Wright *et al.*, 16 Federal Practice and Procedure 2d § 3937, at 696-97 (2d ed. 1996 & Supp. 2003).

"tied together" or "inextricably intertwined." Our resolution of the Eleventh Amendment questions posed by Memphis's appeal would not be material to the decision that Iowa is not an arm of the State of Iowa for Eleventh Amendment purposes and a ruling with respect to Iowa's status under the Eleventh Amendment would be independent of our determinations with respect to Memphis. Accordingly, we will dismiss Iowa's appeal at No. 01-4492 because it was not timely filed, and do not consider whether Iowa is an arm of the State of Iowa for Eleventh Amendment purposes.[8]

## B. THE STATUS OF MEMPHIS ON THIS APPEAL

Temple urges that we should dismiss Memphis's appeal for the following reasons. On November 6, 2002, Temple filed in the district court a notice of dismissal without prejudice of its third-party complaint against Memphis pursuant to Fed. R. Civ. P. 41(a) which provides in pertinent part, with inapplicable exceptions, that "an action may be dismissed by the plaintiff without order of court . . . by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs . . . ." Memphis acknowledged at oral argument before us that the rule is applicable to third-party complaints (a point with which we agree) and that prior to November 6, 2002, notwithstanding its extensive participation in this case, it had not filed an answer or a motion for summary judgment.[9] Thus, the

---

8. We realize that depending on the future course of this litigation we may have to entertain Iowa's Eleventh Amendment arguments following final judgment. Accordingly, there is much to be said in favor of considering them now and possibly saving the parties and the district court from engaging in what may prove, at least in part, to be unnecessary proceedings. Indeed, Iowa makes this very point. Iowa Br. at 14. Nevertheless, a court of appeals cannot create jurisdiction on a theory that it would be convenient to do so. In determining to dismiss Iowa's appeal we have not overlooked the circumstances that we are dismissing Memphis's appeal. Rather, we find it unnecessary to consider whether the dismissal of Memphis's appeal would have eliminated jurisdiction over Iowa's appeal as we have not had such jurisdiction in the first place.

9. The parties have not explained in their procedural histories how Memphis has avoided filing an answer but we are not concerned with this point as our examination of the docket sheet confirms that it has not done so.

dismissal would appear to have removed Memphis from the litigation.

Memphis, nevertheless, urges that the notice of dismissal was ineffective and that, in any event, we should not simply dismiss its appeal without granting it certain relief. With respect to the first contention, it reasons that inasmuch as it filed its appeal before Temple filed its notice of dismissal, the district court did not have jurisdiction to dismiss the case "over those aspects of [the] case included in the appeal." Letter from Peter L. Frattarelli, attorney for Memphis, to court (Nov. 18, 2002). In this regard, Memphis cites *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S.Ct. 400, 402 (1982). Therefore, Memphis considers that it still is a party in the district court. Nevertheless, Memphis does not object to dismissal of its appeal and of Temple's third-party complaint against it "provided that the dismissal of all claims against [it] is with prejudice and that the Court assesses [its] costs to Temple." Letter of November 18, 2002.

In considering whether to dismiss its appeal, we reject Memphis's request that we modify Temple's notice of dismissal in the district court to provide that it is with prejudice. After all, Rule 41(a) provides that "[u]nless otherwise stated in the notice of dismissal . . . the dismissal is without prejudice . . . ." Thus, Temple in specifying that the dismissal was without prejudice merely followed the rule. Consequently, even in the absence of the "without prejudice" provision, the effect of the notice of dismissal would have been the same. Furthermore, we see no reason why Temple should not be able partially to dismiss its third-party complaint as authorized by Rule 41(a).

We, however, are not unmindful of Memphis's claim that it should be awarded its costs. At oral argument before us it pointed out that it had expended substantial funds in defense of this action. Nevertheless, we are satisfied that Temple should not be required to pursue a claim that it seeks to abandon, *i.e.*, the third-party complaint against Memphis, merely because the party against whom it has asserted the claim has expended effort and resources in defense against it. Thus, we will dismiss Memphis's appeal at No. 01-4226 but will do so without prejudice to it

seeking an order from the district court to compensate it for its costs and fees in both the district court and in this court. Of course, we express no opinion on whether it is entitled to recover these expenses as the district court will resolve that issue on the remand of the case we are ordering.

In reaching our result, we are cognizant of Memphis's argument that the notice of dismissal was ineffective as the district court lost jurisdiction over the case when Memphis appealed. To the contrary, we will accommodate that argument by remanding the matter to the district court where Temple again should file the notice of dismissal. *Cf. Venen v. Sweet*, 758 F.2d 117, 123 (3d Cir. 1985) (court of appeals may remand case to the district court for that court to have jurisdiction to grant a motion under Fed. R. Civ. P. 60(b)). In the circumstances, we have no need to determine whether the original notice of dismissal was effective.

We make one further point with respect to Memphis's status. We are dismissing its appeal on the basis of our understanding that Temple continues to wish to dismiss Memphis from the case and thus, on the remand we are ordering, will refile its notice of dismissal. If it does not do so promptly Memphis may move in this court to reinstate its appeal.[10]

## C.   THE JURISDICTIONAL NATURE OF THE ELEVENTH AMENDMENT

The district court permitted the third-party complaint to go forward notwithstanding its holdings that two of the third-party defendants, Memphis and UMass, were arms of their respective states and thus could invoke the Eleventh Amendment. It reached this result because it held that they waived immunity under the Rehabilitation Act by their acceptance of federal funds and because Congress had

---

10. We realize that under our opinion even if Temple does not file the notice of dismissal Memphis could move to dismiss the third-party complaint against it. Inasmuch as we are taxing costs in favor of UMass and Delaware State against Temple the district court might think it appropriate to follow the same course with respect to Memphis.

abrogated their immunity by enacting Title II of the ADA. These holdings permitted the district court to exercise jurisdiction notwithstanding the Eleventh Amendment which recites that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Moreover, as we have indicated, the district court held that there is a right of contribution under the Rehabilitation Act and the ADA. If the court had reached a contrary result either in its abrogation and waiver of immunity holdings or its contribution holding it would have dismissed UMass from this case, and if it reached a contrary result on the contribution issue it would have dismissed Delaware State from the case.[11] Accordingly, there are two independent bases on which it is possible that Temple's contribution claims must fail as a matter of law against the remaining third-party defendants, UMass and Delaware State, either that the Eleventh Amendment precludes the claims against UMass or that neither the Rehabilitation Act nor the ADA permits claims for contribution.[12]

It might be thought that we should consider the statutory construction argument first for in *Hindes v. FDIC*, 137 F.3d

---

11. The court did not reach a definitive conclusion of the question of whether the Eleventh Amendment was applicable to Delaware State as it reserved judgment on that question with respect to the claim for contribution against it on the NJLAD count. Yet, it did deny Delaware State's Eleventh Amendment motion to dismiss on sovereign immunity grounds Temple's claim for contribution on the Title II and section 504 claims as Delaware State did not establish that the amendment was applicable to it. While a contrary result on the immunity question with respect to Delaware State on the Title II and section 504 claims (including the court's abrogation and waiver holdings) also would have led to its dismissal from the case, it does not challenge those determinations on this appeal.

12. There is a third basis on which the contribution claims could fail, *i.e.*, that the third-party complaint did not state a claim on which relief could be granted as a matter of law even if claims for contribution were permissible under the Rehabilitation Act and the ADA. *See* n.16 *infra.* But neither UMass nor Delaware State advances this theory on this appeal.

148, 166 (3d Cir. 1998), we observed that Eleventh Amendment immunity questions are "constitutional in scope" and that "[c]ourts, of course, will avoid such questions where possible." On the other hand, questions as to the scope of the Rehabilitation Act and ADA with respect to the availability of contribution are not constitutional in scope. In *Hindes*, applying the approach of avoiding constitutional questions, we declined to determine whether suit was proper under the *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441 (1908), exception to Eleventh Amendment immunity inasmuch as the anti-injunction provision of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") barred the suit. We explained our ruling in *Hindes* by stating: "[W]e need not decide difficult jurisdictional issues where we can decide the case on another dispositive issue in favor of the party who would benefit by a ruling that we do not have jurisdiction." *Id.* (citing *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 623 (3d Cir. 1996)).

Yet, within one month after we decided *Hindes*, the Supreme Court decided *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003 (1998). In *Steel Co.* the Court rejected the notion of "hypothetical jurisdiction" adopted by some courts of appeals, whereby a court would "assume" jurisdiction for purposes of deciding the merits of a case, at least where the court could resolve the merits question more easily and the prevailing party on the merits would be the same as the prevailing party if jurisdiction were denied. *Id.* at 93-94, 118 S.Ct. at 1012. Inasmuch as in entertaining *Hindes* we exercised hypothetical jurisdiction it would be plausible for us now to hold that notwithstanding *Hindes*, in the light of *Steel Co.*, we initially must address the Eleventh Amendment issues raised on this appeal.

Yet, *Steel Co.* may be somewhat limited as it specifically indicated that "*Article III jurisdiction* is always an antecedent question." *Id.* at 101, 118 S.Ct. at 1016 (emphasis added). In fact, the Court recognized that in its prior cases it had decided, for example, whether a statutory cause of action existed before determining *statutory* standing questions such as whether the plaintiff comes

within the zone of interests protected by the statute. *Id.* at 96-97, 118 S.Ct. at 1013 (citing *Nat'l RR Passenger Corp. v. Nat'l Ass'n of RR Passengers*, 414 U.S. 453, 365 n.13, 94 S.Ct. 690, 696 n.13 (1974)). *Steel Co.*, therefore, should not be understood as requiring courts to answer all questions of "jurisdiction," broadly understood,[13] before addressing the existence of the cause of action sued upon. Instead, that case requires courts to answer questions concerning Article III jurisdiction before reaching other questions.[14]

We, therefore, must consider whether the Eleventh Amendment immunity issues presented by this case are questions of Article III jurisdiction or are at least sufficiently similar to such questions to require application of *Steel Co.* As the *Steel Co.* Court stated, the "triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement." *Id.* at 103-04, 118 S.Ct. at 1017 (footnote omitted). The Eleventh Amendment has little bearing on these Article III concerns. *See Calderon v. Ashmus*, 523 U.S. 740, 745 n.2, 118 S.Ct. 1694, 1697 n.2 (1998) ("While the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power, and, therefore, can be raised at any stage of

---

13. " 'Jurisdiction,' it has been observed, 'is a word of many, too many, meanings.' " *Steel Co.*, 523 U.S. at 90, 118 S.Ct. at 1010 (quoting *United States v. Vanness*, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996)).

14. In fact, even this rule is not hard and fast after *Steel Co.* Three justices in that case would have decided the easier statutory question without reaching the jurisdictional question. *Id.* at 112, 131-34, 118 S.Ct. at 1030-32, (Stevens, J., concurring, joined by Souter, J., and Ginsburg, J.). Three more justices agreed with the majority that the jurisdictional question properly was addressed first in that case, but left open the possibility that in other cases, courts may reserve difficult questions of jurisdiction when the case alternatively could be resolved on the merits in favor of the party who would have prevailed in the absence of jurisdiction. *Id.* at 110-11, 118 S.Ct. at 1020 (O'Connor, J., concurring, joined by Kennedy, J.); *id.* at 111-12, 118 S.Ct. at 1020-21 (Breyer, J., concurring). Thus, six justices maintained the position that in some circumstances a court may reserve certain questions of jurisdiction, even if those questions involve Article III jurisdiction, in favor of deciding the case on statutory grounds. We, however, need not go that far, inasmuch as we are asked to resolve a question not of Article III jurisdiction but of Eleventh Amendment immunity.

the proceedings, we have recognized that it is not coextensive with the limitations on judicial power in Article III."); *but see Wisconsin Dep't of Corrs. v. Schacht*, 524 U.S. 381, 389, 391, 118 S.Ct. 2047, 2052, 2054 (1998) (noting that the "Eleventh Amendment . . . does not automatically destroy original jurisdiction" and that the Court never has resolved whether, or to what extent, "Eleventh Amendment immunity is a matter of subject matter jurisdiction."). It cannot, in any event, seriously be disputed that this case meets the minimum requirements for Article III jurisdiction.

While we have not had occasion to consider whether *Steel Co.* requires the resolution of Eleventh Amendment issues before a court reaches different issues, other courts of appeals have done so. As it happens, they have split fairly evenly on this issue, with three courts reading *Steel Co.* broadly and holding that courts must address the Eleventh Amendment issue first as it raises an Article III type restriction, *Martin v. Kansas*, 190 F.3d 1120, 1126 (10th Cir. 1999); *United States v. Texas Tech Univ.*, 171 F.3d 279, 287 (5th Cir. 1999); *Seaborn v. Florida Dep't of Corrs.*, 143 F.3d 1405, 1407 (11th Cir. 1998), while at least three courts have held to the contrary, *United States ex rel. Long v. SCS Bus. & Tech. Inst., Inc.*, 173 F.3d 890, 892 (D.C. Cir. 1999); *Parella v. Ret. Bd. of the R.I. Employees' Ret. Sys.*, 173 F.3d 46 (1st Cir. 1999); *Kennedy v. Nat'l Juvenile Det. Ass'n*, 187 F.3d 690, 696 (7th Cir. 1999) (not citing *Steel Co.*); *see also Kovacevich v. Kent State Univ.*, 224 F.3d 806, 816 (6th Cir. 2000) (finding that "the Eleventh Amendment is not jurisdictional in nature," but addressing that issue first where a state defendant had raised it). The Supreme Court has not resolved this dispute.

The Court of Appeals for the Fifth Circuit well articulated the view that a court must address Eleventh Amendment issues first. Recognizing that courts often interpret statutes so as to avoid constitutional problems, the court distinguished cases relying on that practice by finding that "[t]he Eleventh Amendment's admonition is jurisdictional in nature." *Texas Tech*, 171 F.3d at 285. The court explained: "While often noted for preserving state sovereignty, the Amendment only accomplishes this end through jurisdictional limitation. . . . Its negative instruction on how

to construe federal judicial power operates as an additional boundary on that power, supplementing the restraints on judicial power already implicitly provided in Article III of the Constitution." *Id.* The court recognized the Supreme Court's recent statement that the Eleventh Amendment "is not co-extensive with the limitations on judicial power in Article III," *Calderon*, 523 U.S. at 745 n.2, 118 S.Ct. at 1697 n.2, but opined that the Eleventh Amendment nonetheless is "certainly intertwined with Article III jurisprudence," *Texas Tech*, 171 F.3d at 285 n.9.

Notwithstanding the views of the Court of Appeals for the Fifth Circuit we are convinced that this "intertwining" does not require that we apply the rule of *Steel Co.* in this case. Rather, we are convinced that the Court of Appeals for the First Circuit expressed a better view in *Parella*. In that case, the court recognized the intertwined nature of the two constitutional provisions, both of which place limits on judicial power. *Parella*, 173 F.3d at 54. The court further noted other characteristics of the Eleventh Amendment that support such a view of the Eleventh Amendment, namely, that the Eleventh Amendment can be raised for the first time on appeal and that a court *sua sponte* may raise Eleventh Amendment issues. *Id.* Nonetheless, the court observed, "the nature of the Eleventh Amendment is more complex than these decisions acknowledge." *Id.* at 54-55. For example, a state may waive Eleventh Amendment immunity, and, although courts may raise Eleventh Amendment issues *sua sponte*, they are not required to do so. *Id.* (citing *Schacht*, 524 U.S. at 389, 118 S.Ct. at 2052).

The characteristics of Eleventh Amendment immunity the court identified in *Parella* comport with Justice Kennedy's understanding that the Supreme Court's "precedents have treated the Eleventh Amendment as 'enact[ing] a sovereign immunity from suit, rather than as a nonwaivable limit on the federal judiciary's subject-matter jurisdiction.'" *Schacht*, 524 U.S. at 394, 118 S.Ct. at 2055 (Kennedy, J., concurring) (quoting *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 267, 117 S.Ct. 2028, 2033 (1997)). Furthermore, as the Court of Appeals for the First Circuit noted in *Parella*, in *Calderon* the Supreme Court stated that the Eleventh Amendment is not co-extensive with Article III's limitations

and that it should consider the question whether an inmate's declaratory judgment action presented an Article III case or controversy before it could consider the parties' Eleventh Amendment and First Amendment contentions. *Parella*, 173 F.3d at 55. If the Supreme Court considered Eleventh Amendment immunity to be an Article III concern, it would be expected that the Court at least would have made reference to it when deciding the Article III question rather than putting the immunity issue aside for consideration after its resolution of the case or controversy issue.

Finally, the main object underlying *Steel Co.* is that courts not declare the law where they do not have Article III jurisdiction because any opinion in such a situation would be advisory, thus raising separation of powers problems. *Steel Co.*, 523 U.S. at 101, 118 S.Ct. at 1016. Eleventh Amendment immunity, on the other hand, does not affect a court's underlying power to hear a given case or controversy. If it did, courts would be obligated to raise Eleventh Amendment issues *sua sponte*, but the Supreme Court has held that they have no such obligation. *See Parella*, 173 F.3d at 55-56 (citing *Schacht*, 524 U.S. at 387-91, 118 S.Ct. at 2052-53). Furthermore, if the presence of Eleventh Amendment immunity implicated case or controversy concerns, states would not be able to waive that immunity by their conduct in a given case.

The Eleventh Amendment's limitations on judicial power are, therefore, in the nature of a constitutional recognition of the states' sovereign immunity, not a statement of a nonwaivable absence of subject-matter jurisdiction. Accordingly, Eleventh Amendment cases do not raise the same separation of powers concerns with respect to hypothetical jurisdiction as do Article III standing cases. We, therefore, hold that, notwithstanding *Steel Co.*, a court may reserve judgment on Eleventh Amendment issues even when advanced by a state where it can resolve the case on other grounds and the prevailing party on the merits would be the same as the prevailing party if immunity were recognized.[15]

---

15. Inasmuch as UMass does not urge that we resolve the Eleventh Amendment questions before we decide the statutory contribution

We follow that course here. Even though, as will be seen, our nonconstitutional disposition of this case will not be easy, still it is better to decide the case on that basis than to address the constitutional jurisdictional issues under the Eleventh Amendment. Thus, we pass the Eleventh Amendment issues with respect to UMass and in view of our conclusions on the contribution issue dismiss its appeal at No. 02-1789 as moot.

### D. RIGHT TO CONTRIBUTION UNDER TITLE II AND THE REHABILITATION ACT

In considering the right to contribution, we start with section 504 of the Rehabilitation Act which provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."[16] 29 U.S.C.

---

questions, conceptually, at least, we could hold that it has waived its Eleventh Amendment immunity to that very limited extent. *See SCS Bus.*, 173 F.3d at 892-93. Indeed, in its brief advancing its Eleventh Amendment arguments, UMass urges that "the right of action for contribution question should be addressed first, as its resolution may avoid the need to address the constitutionality issues herein." UMass Br. at 18 n.3. Moreover, Delaware State has not raised the Eleventh Amendment in this court and, therefore, regardless of what our disposition of UMass's Eleventh Amendment claims might be we, nevertheless, could not avoid considering the contribution issues on this appeal. *See* n.11, *supra*.

16. The district court held in its November 7, 2001 opinion that the circumstances of the case are such that Temple might be able to obtain contribution from the third-party defendants. *Bowers*, 171 F. Supp. 2d at 397-98. We have some question about whether that holding was correct but we neither accept nor reject it. *See, e.g. Harka v. Nabati*, 487 A.2d 432, 434-35 (Pa. Super. Ct. 1985) (Pennsylvania law). In this regard, we point out that the alleged wrongs attributable to Temple and the third-party defendants were independent to the extent that each such university made its own determination with respect to Bowers. *See Cureton*, 198 F.3d at 110 (NCAA "member institutions continue to make individual admission decisions"). On the other hand, they acted similarly because all followed the NCAA rules. We, however, will not decide this case by a review of the district court's view of whether contribution might be available here, except with respect to statutory authorization, inasmuch as neither UMass nor Delaware State has challenged the district court's holding on this point.

§ 794(a). The term "program or activity" includes "a college, university, or other postsecondary institution, or a public system of higher education." *Id.* § 794(b)(2)(A). Though section 504 does not in itself provide a private right of action for aggrieved individuals, it does state that the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.] shall be available to any person aggrieved by any act or failure to act by any recipient of federal financial assistance or federal provider of such assistance under section 794 of this title." *Id.* § 794a(a)(2). Inasmuch as courts have held that Title VI implies a private right of action, "private individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages." *Alexander v. Sandoval*, 532 U.S. 275, 279, 121 S.Ct. 1511, 1516 (2001).

Title II of the ADA provides: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. As in the case of section 504, Title II does not, in terms, create a private right of action. Instead, it provides that the remedies, procedures and rights applicable to section 504 of the Rehabilitation Act also are applicable under Title II. *Id.* § 12133.

Neither statute explicitly provides for a right to contribution. The district court, however, found that such a right exists by applying the reasoning in *Musick, Peeler & Garrett v. Employers Ins. of Wausau*, 508 U.S. 286, 113 S.Ct. 2085 (1993). UMass and Delaware State argue that *Musick* is inapplicable in this case, and that, under *Texas Industries, Inc. v. Racliff Materials, Inc.*, 451 U.S. 630, 101 S.Ct. 2085 (1981), and *Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO*, 451 U.S. 77, 101 S.Ct. 1571 (1981), we should refuse to recognize a right to contribution. Surprisingly, it appears that no federal appellate court, at least of which we are aware, has answered the question of whether there is a right to contribution under Title II or under section 504 of the Rehabilitation Act.

1. *Right of Action or Remedy?*

Preliminarily we consider whether we must determine if a right of contribution is a right of action in itself or whether it is a remedy. In an effort to distinguish this case from *Northwest Airlines* and other cases derived from *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080 (1975), in which the Supreme Court narrowed the circumstances in which a court may find an implied right of action, Temple argues that the right of contribution is a remedy. In Temple's view, we, like the Supreme Court in *Musick*, should decline to apply the strict test for implying a cause of action used in *Cort v. Ash*, *Northwest Airlines*, and *Texas Industries* because this case involves statutes that have been enforced through judicially established rights of action rather than through detailed remedial schemes. Temple argues that instead we should apply a less exacting standard based on *Musick*, asking only whether the availability of a right to contribution should be implied as a proper part of the liability apparatus created by the judiciary to enforce the statutes. Temple Br. at 18. Thus, by treating the right to contribution as a remedy, Temple not only seeks to avoid the *Cort v. Ash* analysis, but also attempts to avail itself of the principle that once a right and cause of action are established, the federal courts are empowered broadly to award any appropriate relief. *See Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 70-71, 112 S.Ct. 1028, 1035-36 (1992).

This argument is something of a red herring, however. To be sure, Supreme Court cases, at least since the 1970s, have referred to rights, rights of action, and remedies separately. Nonetheless, this case should not turn on our characterization of the nature of contribution as the Supreme Court has not determined whether contribution is available by clearly distinguishing among rights, rights of action, and remedies. Thus, in *Northwest Airlines*, the Court stated: "Even though Congress did not expressly create a *contribution remedy*, if its intent to do so may fairly be inferred from either or both statutes, an implied *cause of action for contribution* could be recognized on the basis of the analysis used in cases such as *Cort v. Ash* . . . ." 451 U.S. at 90, 101 S.Ct. at 1580. In *Texas Industries*, the

Court, in deciding whether to find an implied right to contribution, stated that its "focus, as it is in any case involving the implication of a *right of action,* is on the intent of Congress." 451 U.S. at 639, 101 S.Ct. at 2066. Finally, in *Musick* the Court refers to the right of contribution in ways that could support an understanding of the claim as either a right, a right of action, or a remedy. *See* 508 U.S. at 291-92, 113 S.Ct. at 2088.

Thus, contribution cases are unlike discrimination cases, in which the right at issue (the right to be free from discrimination) is distinct from the remedy sought (monetary or injunctive relief), in a way that makes discussion of rights, rights of action, and remedies overlap. Nevertheless, this inconsistency does not overly concern us inasmuch as the key question before us is simply whether *Northwest Airlines/Texas Industries* or *Musick* should guide us and *Musick* did not distinguish the former cases as "right of action" as opposed to remedy cases,[17] but rather did so on more analytic grounds that we will discuss shortly.

### 2. *Supreme Court Precedent Addressing Implied Rights to Contribution*

In *Northwest Airlines*, a class of flight attendants sued its employer, Northwest Airlines, Inc., under the Equal Pay Act and Title VII of the Civil Rights Act of 1964, challenging the legality of the wage differential between pursers (who were males) and stewardesses (who were females). The plaintiff class won at trial, following which Northwest Airlines filed a separate action stating a claim for contribution against two unions that represented the employees with whom Northwest Airlines had bargained collectively in setting the employees' wages. The Supreme Court held that there is not an implied right to contribution under Title VII or the

---

17. Indeed, the *Musick* Court ultimately noted that it was being asked to recognize "a cause of action that supports suit against these parties." 508 U.S. at 292, 113 S.Ct. at 2088. We, too, are inclined to refer to contribution as a cause of action in this context. In other words, Temple asks us to recognize a cause of action for contribution, and the remedy it will receive if successful on this cause of action is a monetary recovery.

Equal Pay Act. *Northwest Airlines*, 451 U.S. at 98, 101 S.Ct. at 1584.

In *Northwest Airlines*, the Court explained that a right to contribution can be created in either of two ways: either Congress could have intended, explicitly or implicitly, to create such a right under *Cort v. Ash*, or "a cause of action for contribution may have become a part of the federal common law through the exercise of judicial power to fashion appropriate remedies for unlawful conduct." *Id.* at 90, 101 S.Ct. at 1580. In examining the first possibility, the Court explained: "In determining whether a federal statute that does not expressly provide for a particular private right of action nonetheless implicitly created that right, our task is one of statutory construction. . . . The ultimate question in cases such as this is whether Congress intended to create the private remedy—for example, a right to contribution—that the plaintiff seeks to invoke." *Id.* at 91, 101 S.Ct. at 1580 (citation omitted). Factors relevant to Congress's intent include legislative history, the underlying purpose and structure of the statutory scheme, and the likelihood that Congress intended to supersede or to supplement existing state remedies. *Id.*, 101 S.Ct. at 1580 (citing *Cort v. Ash*, 422 U.S. at 78, 95 S.Ct. at 2088; *Cannon v. Univ. of Chicago*, 441 U.S. 677, 689-709, 99 S.Ct. 1946, 1953-64 (1979)).

The Court then asked whether the language of the statute demonstrated an intent to create a right of contribution. Noting that neither statute expressly created such a right, the Court explained that "[t]his omission, although significant, is not dispositive if, among other things, the language of the statutes indicates that they were enacted for the special benefit of a class of which the petitioner is a member." 451 U.S. at 91-92, 101 S.Ct. at 1580-81. The Court concluded, however, that "it cannot possibly be said that employers are members of the class for whose especial benefit either the Equal Pay Act or Title VII was enacted . . . . To the contrary, both statutes are expressly directed against employers; Congress intended in these statutes to regulate their conduct for the benefit of employees . . . . In light of this fact, petitioner 'can scarcely lay claim to the status of "beneficiary" whom Congress

considered in need of protection.'" *Id.* at 92, 101 S.Ct. at 1581 (citation and footnotes omitted).

On this point, the Court specifically rebuked the court of appeals, which had refused to apply *Cort v. Ash* literally in evaluating the claim of a right to contribution. *Id.* at 92 n.25, 101 S.Ct. at 1581 n.25. The court of appeals had asked, instead, whether employees could bring suit against their unions under the statutes. The Court stated that this inquiry confused the question whether the elements of a contribution claim are established in a given case—a fact the Court assumed in deciding the case and which, we also assume here[18]—with the question of whether Congress intended that contribution should be available under any circumstances. Thus, "[t]he Court of Appeals erred . . . because it failed to focus on whether the party seeking to invoke the implied remedy is a member of a class that Congress intended to benefit." *Id.*, 101 S.Ct. at 1581 n.25.

Next, the Court considered whether the structure of the statutes might suggest that Congress intended to create a right of contribution. Noting that both statutes established "comprehensive programs designed to eliminate certain varieties of employment discrimination" and contained "express provision for private enforcement in certain carefully defined circumstances, and provide[d] for enforcement at the instance of the Federal government in other circumstances," the Court concluded that "[t]he comprehensive character of the remedial scheme expressly fashioned by Congress strongly evidences an intent not to authorize additional remedies." *Id.* at 93-94, 101 S.Ct. at 1581-82. The Court explained that "[i]t is, of course, not within our competence as federal judges to amend these comprehensive enforcement schemes by adding to them another private remedy not authorized by Congress." *Id.* at 94, 101 S.Ct. at 1582.

Finally, the Court noted that nothing in the legislative history suggested a congressional intent to create a right to contribution. *Id.*, 101 S.Ct. at 1582. The Court recognized

---

18. We make this assumption in view of our determination that it would be inappropriate, even if possible to do so, to decide this case on a sufficiency of the pleading basis. *See* n.16, *supra.*

that it is not uncommon in an implied right of action case to encounter such legislative silence and that, on its own, such silence is not necessarily inconsistent with an intent to create the remedy suggested. *Id.*, 101 S.Ct. at 1582. Nonetheless, in the absence of suggestions in the statutory language or structure that Congress intended to create such a right of action, "the essential predicate for implication of a private remedy simply does not exist." *Id.*, 101 S.Ct. at 1582.[19]

The Court also considered the second possible source of a right of contribution, namely, federal common law. The Court noted that, except in limited circumstances such as cases involving the rights or duties of the United States or resolution of interstate controversies, the courts' power to fashion federal common law is strictly limited. *Id.* at 95, 101 S.Ct. at 1582. The Court distinguished *Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106, 94 S.Ct. 2174 (1974), in which it had found a nonstatutory right to contribution in the admiralty setting, noting that the constitutional grant of general admiralty jurisdiction to the federal courts provides a basis for development of judge-made rules in the area of maritime law. *Id.* at 95-96, 101 S.Ct. at 1583. Finally, the Court concluded that it should not create a right to contribution where Congress had "enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." *Id.*, 101 S.Ct. at 1584. The Court left open the question whether federal courts may have more power to fashion remedies in other areas of the law, such as under the antitrust laws, under which federal courts act more as common law courts. *Id.* at 98 & n.42, 101 S.Ct. at 1584 & n.42.

That same term the Court addressed a question not involved in but referred to in *Northwest Airlines* and concluded that the antitrust laws do not confer on federal courts the power to formulate a right to contribution where Congress has not created the right explicitly. *Texas Indus.*,

---

19. In a footnote, the Court stated that in a case where neither the statute nor the legislative history reveals a congressional intent to create a private right of action for the benefit of the plaintiff, the *Cort v. Ash* inquiry need continue no further. *Id.* 94 n.31, 101 S.Ct. at 1582 n.31.

451 U.S. at 646, 101 S.Ct. at 2070. The Court analyzed the question of whether the antitrust laws establish a right of contribution in the same manner as in *Northwest Airlines*. It concluded that there was no congressional intent to create such a right, noting that there was no indication of such an intent in the language of the statute or in the legislative history. *Id.* at 639, 101 S.Ct. at 2066. The Court again noted that the statutes in question "were not adopted for the benefit of the participants" in the prohibited conduct in question. *Id.*, 101 S.Ct. at 2066. Rather, the petitioner was " 'a member of the class whose activities Congress intended to regulate for the protection and benefit *of an entirely distinct class* . . . .' " *Id.*, 101 S.Ct. at 2066 (quoting *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 37, 97 S.Ct. 926, 947 (1977) (emphasis in *Texas Industries)*). The Court, therefore, concluded that any right to contribution could be derived only from federal common law.

The Court then expanded on its discussion in *Northwest Airlines* of federal courts' power to recognize a right of contribution as part of federal common law. The Court explained that the power to formulate federal common law is implicated in two basic types of cases: where a federal rule of decision is necessary to protect "uniquely federal interests," and where "Congress has given the courts the power to develop substantive law." *Id.* at 640, 101 S.Ct. at 2067. The Court found that antitrust suits, which involve the rights and interests of private parties, do not involve the duties of the federal government, the distribution of powers in the federal system, or matters necessarily subject to federal control, and, therefore, do not involve "uniquely federal interests." *Id.* at 642, 101 S.Ct. at 2068.

With regard to the second type of case in which courts have the power to formulate federal common law, the paradigmatic case is *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912 (1957), in which the Supreme Court read section 301 of the Labor Management Relations Act not only as a grant of jurisdiction over certain areas of labor law but also as a grant of the power to develop common law of labor-management relations. *Texas Indus.*, 451 U.S. at 642-43, 101 S.Ct. at 2068. The Court noted that federal courts traditionally had broad common law

powers under the antitrust laws as well. *Id.* at 643, 101 S.Ct. at 2068. Nonetheless, the Court held that, although Congress intended to give the courts the power to develop common law defining violations of the antitrust laws, there was no similar indication of congressional intent with regard to the provisions of the antitrust laws providing for treble damages and other remedies. *Id.* at 643-44, 101 S.Ct. at 1068-69. Instead, the Court held, the "detailed and specific" remedial provisions set forth in the Sherman Act give rise to a strong presumption that Congress deliberately omitted a contribution remedy from the statute. *Id.* at 644-45, 101 S.Ct. at 2069-70. The Court, therefore, concluded that the antitrust laws do not confer on federal courts "the broad power to formulate the right to contribution sought here." *Id.* at 646, 101 S.Ct. at 2070.

In *Musick,* however, the Court followed a different course, distinguishing *Northwest Airlines* and *Texas Industries* and holding that defendants in an action under Rule 10b-5 of the Securities Exchange Commission adopted pursuant to the Securities Exchange Act of 1934 have a right to seek contribution under federal law. 508 U.S. at 297, 113 S.Ct. at 2091. The Court distinguished *Northwest Airlines* and *Texas Industries,* as well as the precedents on which those cases were based, as follows:

> The federal interests in both *Texas Industries* and *Northwest Airlines* were defined by statutory provisions that were express in creating the substantive damages liability for which contribution was sought. Recognizing that the applicable statutes did not 'implicate "uniquely federal interests" of the kind that oblige courts to formulate federal common law,' *Texas Industries,* 451 U.S. at 642, 101 S.Ct. at 2068, we asked whether Congress 'expressly or by clear implication' envisioned a contribution right to accompany the substantive damages right created, *id.* at 638, 101 S.Ct. at 2066, or, failing that, whether Congress 'intended courts to have the power to alter or supplement the remedies enacted,' *id.* at 645, 101 S.Ct. at 2069 . . . . But these inquiries are not helpful in the present context. The private right of action under Rule 10b-5 was implied by the Judiciary on the theory courts should recognize

> private remedies to supplement federal statutory duties, not on the theory Congress had given an unequivocal direction to the courts to do so. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 737, 95 S.Ct. 1917, 1922, 1926, 44 L.Ed.2d 539 (1975). Thus, it would be futile to ask whether the 1934 Congress also displayed a clear intent to create a contribution right collateral to the remedy. [*See Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 76, 112 S.Ct. 1028, 1039, 117 L.Ed.2d 208 (1992); *id.* at 77, 112 S.Ct. at 1039 (Scalia, J., concurring)].

*Id.* at 290-91, 113 S.Ct at 2087-88. In response to the argument that the precedents on which *Northwest Airlines* and *Texas Industries* were based should control, the Court continued:

> This argument . . . would have much force were the duty to be created one governing conduct subject to liability under an express remedial provision fashioned by Congress, or one governing conduct not already subject to liability through private suit. That, however, is not the present state of the jurisprudence we consider here. The parties against whom contribution is sought are, by definition, persons or entities alleged to have violated existing securities laws and who share joint liability for that wrong under a remedial scheme established by the federal courts. Even though we are being asked to recognize a cause of action that supports a suit against these parties, the duty is but the duty to contribute for having committed a wrong that courts have already deemed actionable under federal law. The violation of the securities laws gives rise to the 10b-5 private cause of action, and the question before us is the ancillary one of how damages are to be shared among persons or entities already subject to that liability. Having implied the underlying liability in the first place, to now disavow any authority to allocate it on the theory that Congress has not addressed the issue would be most unfair to those against whom damages are assessed.

> We must confront the law in its current form. The federal courts have accepted and exercised the

> principal responsibility for the continuing elaboration of the scope of the 10b-5 right and the definition of the duties it imposes. As we recognized in a case arising under § 14(a) of the 1934 Act, 15 U.S.C. § 78n(a), 'where a legal structure of private statutory rights has developed without clear indications of congressional intent,' a federal court has the limited power to define 'the contours of that structure.' *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1104, 111 S.Ct. 2749, 2764, 115 L.Ed.2d 929 (1991). As to this proposition we were unanimous. See *ibid.* (SOUTER, J., joined by REHNQUIST, C.J., and WHITE, O'CONNOR, and SCALIA, JJ.); id., at 1114, 111 S.Ct., at 2768 (KENNEDY, J., joined by MARSHALL, BLACKMUN, and STEVENS, JJ., concurring in part and dissenting in part) ('Where an implied cause of action is well accepted by our own cases and has become an established part of the securities laws . . . we should enforce it as a meaningful remedy unless we are to eliminate it altogether'). See also *Blue Chip Stamps*, *supra*, at 737, 95 S.Ct., at 1926 (recognizing the authority of federal courts to 'define the contours of a private cause of action under Rule 10b-5' and 'to flesh out the portions of the law with respect to which neither the congressional enactment nor the administrative regulations offer conclusive guidance').

*Id.* at 292-93, 113 S.Ct. at 2088-89. The Court found support for its conclusions in two amendments to the securities laws, in which Congress appeared to acknowledge the judicially created Rule 10b-5 action "without any further expression of legislative intent to define it." *Id.* at 294, 113 S.Ct. at 2089.

Having declined to follow *Northwest Airlines* and *Texas Industries*, the Court turned to "the question whether a right to contribution is within the contours of the 10b-5 action." *Id.*, 113 S.Ct. at 2089. The Court explained, however, that its "task is not to assess the relative merits of the competing rules, but rather to attempt to infer how the 1934 Congress would have addressed the issue had the 10b-5 action been included as an express provision in the 1934 Act." *Id.*, 113 S.Ct. at 2090. The Court acknowledged

that this exercise may appear to be "not a promising venture as a general proposition," but, nonetheless, found that other specific sections of the 1934 Act to which Rule 10b-5 was analogous provided a right of contribution. *Id.* at 295-97, 113 S.Ct. at 2090-91.

Beginning with the language of section 10(b) itself, the Court noted that the text provided little guidance as to a right to contribution, but found that "[h]aving made no attempt to define the precise contours of the private cause of action under § 10(b), Congress had no occasion to address how to limit, compute, or allocate liability arising from it." *Id.* at 295, 113 S.Ct. at 2090. The Court then compared Rule 10b-5 to the eight express liability provisions in the 1933 Securities Act and the 1934 Securities Exchange Act, and found that it was most similar to two provisions that conferred an explicit private right of action, because both provisions targeted the same danger that was the focus of section 10(b), because both had the same purpose "to deter fraud and manipulative practices in the securities markets and to ensure full disclosure of information material to investment decisions," and because Rule 10b-5 defendants stood in a similar position to defendants in actions based on the other two provisions. *Id.* at 296, 113 S.Ct. at 2090-91. Because those two provisions each contained "nearly identical express provisions for a right to contribution," the Court concluded: "Absent any showing that the implied § 10(b) liability structure or the 1934 Act as a whole will be frustrated by finding a right to contribution paralleling the right to contribution in analogous express liability provisions, our task is complete and our resolution clear: Those charged with liability in a 10b-5 action have a right to contribution against other parties who have joint responsibility for the violation." *Id.* at 298, 113 S.Ct. at 2091-92.

### 3. *Applicability of* Musick *Analysis*

Although the Court's decision in *Musick* may seem to have been something of a departure from the course it appeared to be setting in *Northwest Airlines* and *Texas Industries*, we can read the three cases harmoniously. When a statute creates a private right of action but fails to

provide expressly for a right to contribution, particularly if the remedial scheme created is detailed, Congress's silence with regard to contribution weighs heavily against implying such a right because there is a presumption that the silence reflects congressional intent *not* to create such a right. On the other hand, when courts have implied a right of action it would be "futile" to look for congressional intent to create a right to contribution, inasmuch as Congress did not intend explicitly to create the cause of action on which such a right would be based. *Musick*, 508 U.S. at 291, 113 S.Ct. at 2088. In that situation, courts have somewhat broader latitude to determine whether a right to contribution is consistent with Congress's intent in creating the right sought to be enforced. The first question we must resolve, therefore, is whether the private rights of action under section 504 of the Rehabilitation Act and Title II are express or implied.

This question is not as easily answered as one might expect.[20] In discussing rights and remedies available to aggrieved persons, Title II cross-references the Rehabilitation Act, which in turn cross-references Title VI of the Civil Rights Act of 1964. Title II was enacted in 1990, while the Title VI cross-reference of the Rehabilitation Act was enacted in 1978. By 1978, courts had recognized a private right of action under Title VI for at least a decade. *Cannon*, 441 U.S. at 696-97, 99 S.Ct. at 1957 (finding support, in a case decided in 1979, for a holding that Title IX of the Educational Amendments of 1972, which was modeled on Title VI, creates a private right of action from the fact that a 1967 decision of the Court of Appeals for the Fifth Circuit, *Bossier Parish School Board v. Lemon*, 370 F.2d 847 (5th Cir. 1967), finding a private right of action under Title VI "was repeatedly cited with approval and never questioned during the ensuing five years" and by "presuming both that [the members of Congress who enacted Title IX in 1972] were aware of the prior interpretation of Title VI and that that interpretation reflects their intent with respect to Title IX").

---

20. All parties seem to assume in their briefs that private rights of action under both acts have been implied by courts.

Thus, although the remedy available to persons aggrieved by violations of the Rehabilitation Act and Title II is at root an implied one, those statutes, by cross-referencing Title VI, which already had been interpreted as creating a private right of action, arguably contain explicit provisions creating a private right of action. Indeed, the legislative history discussing Title II's cross-reference to sections 504 and 505 of the Rehabilitation Act explicitly states: "As with section 504, there is also a private right of action for persons with disabilities, which includes the full panoply of remedies." H.R. Rep. No. 101-485, pt. 2, at 98, *reprinted in* 1990 U.S.C.C.A.N. 303, 381; *id.*, pt. 3, at 52, *reprinted in* 1990 U.S.C.C.A.N. 445, 475 ("As in title I, the Committee adopted an amendment to delete the term 'shall be available' in order to clarify that Rehabilitation Act remedies are the only remedies which title II provides for violations of title II. The Rehabilitation Act provides a private right of action, with a full panoply of remedies available, as well as attorney's fees.").

Thus, Title II and section 504 are unlike Title VII of the Civil Rights Act of 1964 or the antitrust laws, which spell out the private right of action available to aggrieved individuals, but are also unlike Rule 10b-5, which does not by its language contemplate any sort of private right of action. Of course, both the statutory language and the legislative history of Title II and section 504 are silent with respect to a right of contribution. The cross-reference language in both acts, therefore, could support two distinct inferences with respect to Congress's intent: either Congress intended to make available to aggrieved persons the Title VI rights and remedies in place at the time of passage of the two provisions (1978 for the Rehabilitation Act and 1990 for the ADA) or Congress intended to allow the rights and remedies under Title II and section 504 to expand and retract as the courts defined the contours of Title VI liability.

If the former is true, then we can say that, because reported cases had not found a right to contribution under Title VI as of 1978 or 1990 (or indeed as of the present), Congress must not have considered a right to contribution to be a part of the liability scheme of Title VI that should be

incorporated into the liability schemes of section 504 and Title II. In other words, even though Congress acknowledged the private right of action under Title VI, which had been recognized by courts since at least 1967, and intended to make a similar private right of action available under section 504 and Title II, Congress could not be said to be acknowledging a right to contribution under Title VI, as the courts had not yet recognized that right. Congress likely would have included language explicitly providing for a right to contribution had it intended to expand the Title VI rights and remedies incorporated into section 504 and Title II. On the other hand, if we draw the latter reference, then we should read the cross-referencing language as an acknowledgment not of solely those rights and remedies available at the time of passage of the acts (*e.g.*, a private right of action but not a right to contribution) but also of the power of federal courts to define the contours of Title VI (and, therefore, section 504 and Title II) liability in much the same way a common law court might.

We find that Congress's decision to incorporate Title VI's rights and remedies, including those defined by courts rather than by Congress itself, into the Rehabilitation Act and Title II by simple cross-reference, without attempting to define more precisely those rights and remedies, constitutes a recognition on Congress's part of the somewhat broader role of federal courts in defining the contours of Title VI (and, therefore, section 504 and Title II) liability. Congress's use of cross-referencing language in section 504 and Title II is similar, in analytic terms, to the amendments to the securities laws considered by the *Musick* Court. Those two amendments made explicit reference to "any cause of action implied from a provision under this title" and to "any private civil action implied under . . . this title." *Musick*, 508 U.S. at 293-94, 113 S.Ct. at 2089. From this language, the Court reached the same conclusion we reach here with respect to section 504 and Title II: "We infer from these references an acknowledgment of the 10b-5 action without any further expression of legislative intent to define it." *Id.* at 294, 113 S.Ct. at 2089. The Court used this inference to support its recognition of "judicial authority to shape, within limits, the 10b-5 cause of action." *Id.* at 293, 113

S.Ct. at 2089. Similarly, through the cross-referencing language of the Rehabilitation Act and Title II, Congress acknowledged the private Title VI right of action implied by courts, but made no effort to define it more precisely.[21] "That task, it would appear, Congress has left to us." *Id.* at 294, 113 S.Ct. at 2089.

The legislative history of the ADA lends some support to this view. In its discussion of Title III of the ADA, which prohibits discrimination in public accommodations and, therefore, cross-references the parallel Title II of the 1964 Civil Rights Act of 1964, the legislative history states: "*As with other titles of the bill*, the Committee intends that persons with disabilities have remedies and procedures parallel to those available under comparable civil rights laws. Thus, if the remedies and procedures change in title II of the 1964 Act, . . . they will change identically in this title for persons with disabilities." H.R. Rep. No. 101-485, pt. 3, at 66, *reprinted in* 1990 U.S.C.C.A.N. 445, 490 (emphasis added).

Furthermore, Congress rejected the minority view of certain members that an amendment to Title I, which prohibits employment in discrimination and cross-references the parallel Title VII of the Civil Rights Act of 1964, should be adopted that would provide expressly for only then-existing Title VII remedies. *Id.*, pt. 2, at 167, *reprinted in* 1990 U.S.C.C.A.N. 303, 444-45. The minority members were concerned that Congress was considering the Civil Rights Act of 1990, which would amend Title VII to include punitive and compensatory damages as well as

21. Indeed, as noted above, the legislative history of the ADA makes even more plain Congress's recognition of the judicially implied private right of action under Title VI and section 504: "As with section 504, there is also a private right of action for persons with disabilities, which includes the full panoply of remedies." H.R. Rep. No. 101-485, pt. 2, at 98, *reprinted in* 1990 U.S.C.C.A.N. 303, 381. Furthermore, the Supreme Court has noted that section 1003 of the Rehabilitation Act, which was enacted in 1986 to abrogate the states' immunity to suit and which referred to remedies at law and in equity " 'cannot be read except as a validation of *Cannon*'s holding' " that Title VI creates a private right of action. *Alexander*, 532 U.S. at 280, 121 S.Ct. at 1516 (quoting *Franklin*, 503 U.S. at 72, 112 S.Ct. at 1036).

injunctive relief and backpay, and, by reason of the cross-reference in Title I, might be thought to allow such damages in cases under Title I of the ADA as well. *Id.* Indeed, Representative Sensenbrenner offered an amendment on the last day of debate on the ADA that would have replaced Title I's cross-referencing language with express remedial provisions permitting only injunctive relief and the award of back pay. 136 Cong. Rec. H2599-01, H2612, 1990 WL 67606. In the ensuing debate, however, many other members of Congress expressed the view succinctly expressed by Representative Edwards, namely, that "the heart of the Americans with Disabilities Act is to give the same civil rights protections to persons with disabilities that racial minorities and women have." *Id.* at H2615 (statement of Rep. Edwards); *see also, e.g., id.* (statement of Rep. Schroeder); *id.* at 2616 (statement of Rep. Glickman); *id.* (statement of Rep. Fish); *id.* at 2618 (statement of Rep. Bartlett); *id.* at 2620 (statement of Rep. Mazzoli). The proposed amendment subsequently was defeated and Congress approved the cross-referencing language on the theory that persons discriminated against on the basis of a disability should receive the same remedies as those subject to discrimination on the basis of race or sex.

Although this legislative history does not reveal explicitly Congress's view of the courts' role in defining the contours of the rights and remedies under the ADA, when taken together with Congress's implicit acknowledgment of the judicially created private Title VI right of action and failure to define that action further, it supports the inference that Congress intended to leave to the courts the task of defining the contours of liability—including the existence of a right of contribution—under Title VI, section 504 of the Rehabilitation Act, and Title II of the ADA. Of course, in turning to the question whether a right of contribution is within the contours of the private section 504 and Title II actions, we must not consider the relative efficiencies or equities of the parties' arguments, but rather must ask how the Congresses that enacted the Rehabilitation Act and the ADA would have addressed the issue had the private rights of action under those acts been included as express provisions. *See Musick*, 508 U.S. at 294, 113 S.Ct. at 2089-90. Unlike the 1934 Congress whose actions in enacting

section 10(b) were considered in *Musick*, however, both Congresses in this case clearly contemplated the existence of some private right of action, even if they did intend to leave further definition of that right to the courts. That no right to contribution under Title VI had been recognized when the Rehabilitation Act and Title II were enacted and that Congress did not provide explicitly for such a right suggests that Congress did not intend for such a right to exist. We do not regard this evidence as conclusive, however, but must weigh it along with the other considerations that the *Musick* court identified.

### 4. *Application of* Musick *Analysis*

In holding that a right to contribution was consistent with the overall structure of the 1934 act, the *Musick* Court considered express liability provisions of the 1933 and 1934 acts and found that two of the eight express liability provisions in the 1934 act were analogous to Rule 10b-5 in structure, purpose, and intent. Because those provisions expressly created a right to contribution, the Court held that implying such a right in a Rule 10b-5 action was consistent with the 1934 act. *Id.* at 295-97, 113 S.Ct. at 2090-91. The Court also found relevant the fact that most courts of appeals had recognized a right to contribution in Rule 10b-5 actions for more than 20 years. *Id.* at 297-98, 113 S.Ct. at 2091.

UMass and Delaware State argue that, in considering analogous statutes, we need look no further than section 503 of the Rehabilitation Act and Title I of the ADA, which prohibit discrimination in employment and which, because their remedies are derived from Title VII of the Civil Rights Act of 1964, do not, after *Northwest Airlines*, create a right of contribution. Temple argues that the purpose of section 504 and Title II is not simply to prohibit discrimination but also, unlike other civil rights laws such as section 503 and Title I, to regulate recipients of federal funds and ensure that government money is not spent on programs that discriminate. Temple suggests that, because section 504 and Title II are examples of Spending Clause legislation, we should look to contract law, not to other civil rights

statutes, in deciding whether to allow a right to contribution.[22] Temple Br. at 26-32.

In *Barnes v. Gorman*, 536 U.S. 181, 122 S.Ct. 2097 (2002), the Supreme Court held that punitive damages are not available under Title II and section 504. Relying on the contract analogy, the Court stated that "[a] funding recipient is generally on notice that it is subject not only to those remedies explicitly provided in the relevant legislation, but also to those remedies traditionally available in suits for breach of contract." *Id.* at 187, 122 S.Ct. at 2101. The Court explained its holding in *Franklin* that compensatory damages are available under Title IX of the Educational Amendments of 1972, although not expressly provided, and its holding in *Cannon* that injunctive relief is similarly available on the grounds that those remedies are "forms of relief traditionally available in suits for breach of contract." *Id.*, 122 S.Ct. at 2101. Punitive damages, however, are not generally available for breach of contract, and the Court, therefore, held that they should not be available under Title II and section 504 either. *Id.* at 187-88, 122 S.Ct. at 2102. But Temple argues that contribution is different as it generally is available in suits for breach of contract. *See* 12 Samuel Williston, Law of Contracts § 36.14 (4th ed. 1999).

The Court in *Barnes* stated that the contract law analogy may apply in Spending Clause cases defining the scope of damages remedies, deciding whether a damages remedy is available at all, and "defining the scope of conduct for

---

22. In support of this contention, Temple cites *Chemung Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 15-16 (2d Cir. 1991), in which the Court of Appeals for the Second Circuit held that a defendant in an ERISA breach of fiduciary duty case had a right to contribution as a matter of federal common law because trust law, on which ERISA was based, traditionally allowed contribution. The court found its power to recognize such a right in the Supreme Court's unequivocal statements that "'courts are to develop a federal common law of rights and obligations under ERISA-regulated plans.'" *Id.* at 16 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S.Ct. 948, 954 (1989) (internal quotation omitted)). However, inasmuch as Title VI, the Rehabilitation Act, and the ADA do not confer a similarly broad common law power on the courts, *Chemung* is of little value to us in this case.

which funding recipients may be held liable for money damages." *Id.* at 186-87, 122 S.Ct. at 2101. The principle supporting the analogy in each of these types of cases is that in Spending Clause cases " 'in return for federal funds, the [recipients] agree to comply with federally imposed conditions.' " *Id.* at 186, 122 S.Ct. at 2100-01 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1540 (1981) (alteration in original)). In other words, the task for courts in such cases is to define the "contractual" terms, that is, to hold recipients to the terms of their bargain but not to impose conditions of which the recipient could not fairly have been aware.

Although we may assume that a defendant in a traditional common law breach of contract case would be entitled to contribution, we share the sentiment expressed by two Justices in the 5-4 *Barnes* majority, namely that "the contract-law analogy may fail to give such helpfully clear answers to other questions that may be raised by actions for private recovery under Spending Clause legislation . . . ." *Id.* at 191, 122 S.Ct. at 2103 (Souter, J., and O'Connor, J., concurring); *see also id.* at 186, 122 S.Ct. at 2101 (majority opinion) ("[W]e have been careful not to imply that *all* contract-law rules apply to Spending Clause legislation . . . ." (emphasis in original)). Unlike the Court in *Barnes* and the cases cited therein, such as *Franklin* and *Pennhurst*, we are being asked here to formulate a right that belongs not to a member of the class Congress sought to protect, but that instead benefits solely a *violator* of the duties Congress created for the protection of that class.[23] This case, therefore, does not fit easily within the line of cases relying on the " 'traditional presumption in favor of *any appropriate relief* for violation of a federal right' " in finding implied remedies. *Id.* at 185, 122 S.Ct. at 400 (quoting *Franklin*, 503 U.S. at 73, 112 S.Ct. at 1036) (emphasis in *Barnes*). Because *Barnes* used the contract-law analogy to determine the scope of

---

23. It, of course, should be understood that we are not suggesting that Temple violated anything. Rather, if Bowers is to prevail in this action, he must carry the burden to establish that it did so. We simply refer to Temple as though it is a violator because unless it is the contribution issue evaporates.

"appropriate relief" under *Franklin*, that analogy can be of only limited use to us here, where the *Franklin* presumption does not apply.

Thus, in looking for analogous provisions under *Musick*, we look, as did the *Musick* Court, to other sections of the legislation creating the cause of action sued on for guidance, not to contract law. To do otherwise, we would have to read *Musick* as conferring a broad common law power on the federal courts to create a right of contribution in cases involving an implied right of action as long as the court could find support for such a right in any other analogous area of the law. *Musick*, however, does not give the federal courts such broad power. A court must look not to any analogous area of the law, but rather to the intent of Congress insofar as the court can distill that intent from the structure and language of the legislation as a whole. In this case we, therefore, look to the rest of the ADA and the Rehabilitation Act for guidance.[24]

In particular, we look to other provisions of these statutes that are "close in structure, purpose, and intent" to the private right of action under Title II and section 504. *Id.* at 295, 113 S.Ct. at 2090. In *Musick*, the Court found that two sections of the 1934 act are close in structure,

---

24. Temple vigorously argues that we should not look to Title I of the ADA or Title VII, on which Title I of the ADA is based, in deciding whether a right to contribution is consistent with the statutory scheme as a whole because the purposes behind the two sets of statutes are different. Temple Br. at 27-28. We recognize that while Title VII is clearly remedial civil rights legislation designed to protect individuals, Title VI has the twin goals of protecting individuals and of regulating the use of federal funds in public programs. *See Cannon*, 441 U.S. at 704, 99 S.Ct. at 1961. Temple urges us to ignore Title VII and to focus instead on whether a right to contribution is consistent with the purpose of Title VI to regulate recipients of federal funds. Whatever the merits of Temple's argument that a right to contribution is consistent with that goal, we are unwilling to ignore the twin goal of Title VI to protect individuals from discrimination in public programs. Moreover, we must not ask whether a right to contribution is desirable as a policy matter, but whether the Congresses that enacted Title II and section 504 would have provided for such a right if they had created a private right of action. *Musick*, 508 U.S. at 294, 113 S.Ct. at 2089-90. For both of these reasons, we turn for guidance to Title I of the ADA and to Title VII.

purpose, and intent to the Rule 10b-5 action for two reasons: (1) they target the precise dangers that are the focus of section 10(b) and are motivated by the same intent to deter fraud in the securities market and to ensure full disclosure of material information; and (2) they impose liability on defendants who stand in a position most similar to 10b-5 defendants for the sake of assessing whether they should be entitled to contribution. 508 U.S. at 295-96, 113 S.Ct. at 2090-91. Looking to the other liability provisions of the Rehabilitation Act and the ADA, it is clear that none are as close in structure, purpose, and intent to the private section 504 and Title II actions as the two 1934 act provisions used by the Court in *Musick* are to Rule 10b-5. Yet, because those provisions closest in structure, purpose, and intent to section 504 and Title II and the legislative history and structure of the statutes do not suggest that Congress would have created a right to contribution had it created an explicit private right of action for violations of either section 504 or Title II, we hold that there is no right to contribution under either of those provisions.

Among the declared purposes of the Rehabilitation Act of 1973 was authorization of programs to develop and implement comprehensive and continuing state plans for meeting the need for providing vocational rehabilitation services to disabled persons "and to provide such services *for the benefit of such individuals*," Rehabilitation Act of 1973, Pub. L. No. 93-112, § 2(1) (1973) (emphasis added); to "initiate and expand services to groups of handicapped individuals . . . who have been underserved in the past," *id.* § 2(6); and to "promote and expand employment opportunities in the public and private sectors for handicapped individuals and to place such individuals in employment," *id.* § 2(8). The statement of purpose was amended in 1978, simultaneously with the amendments creating private rights of action by cross-reference to read: "The purpose of this Act is to develop and implement, through research, training, services, and the guarantee of equal opportunity, comprehensive and coordinated programs of vocational rehabilitation and independent living." Pub. L. No. 95-602, § 122(a)(1) (1978).

To further this purpose, Title V of the Rehabilitation Act prohibits certain entities from discriminating against

persons with disabilities. Section 501 requires all executive branch agencies and departments to submit affirmative action plans for the hiring and advancement of disabled persons and prohibits discrimination on the basis of disability in federal employment. 29 U.S.C. § 791. Section 503 requires all federal contractors to take affirmative action to employ and advance in employment qualified persons with disabilities. *Id.* § 793. Finally, section 504 prohibits any program or activity receiving federal funds from discriminating against persons with disabilities. *Id.* § 794. From 1973 to 1978, the federal courts generally began to recognize a private right of action under section 504, but not under section 501, while the courts were split on the question whether a private right of action existed under section 503. *See Smith v. United States Postal Serv.*, 742 F.2d 257, 259 (6th Cir. 1984). In 1978, Congress amended the act to create private remedies for violations of sections 501 and 504 in order to clarify the confusion in the lower courts. *Id.* Congress, however, did not create a right of action under section 503 with the 1978 amendments, and every court of appeals facing the question since has held that an implied right of action does not exist under that provision. *See* 2 Americans With Disabilities: Practice and Compliance Manual § 8:272 (2003) (compiling cases from every court of appeals).

Section 501 is, therefore, the only other liability provision in the Rehabilitation Act that is even arguably similar to section 504. While the analogy is not perfect, the two sections share the basic goal of protecting persons with disabilities from discrimination, much in the same way as the statutes at issue in *Musick* shared the common goal of deterring fraud and ensuring full disclosure of material information. Furthermore, defendants in a section 501 action "stand in a position" similar to defendants in a section 504 action in that the two sections impose direct liability on defendants for their own acts as opposed to derivative liability. *See Musick*, 508 U.S. at 296, 113 S.Ct. at 2090. But section 501 does not provide for a right to contribution, nor does any court appear to have recognized a right to contribution in a section 501 action.[25] Indeed,

---

25. Of course, the circumstances in which a court might be asked to recognize such a right in a section 501 case are not clear, inasmuch as the United States is likely to be the only defendant in the case.

there is no provision of the Rehabilitation Act that appears to contemplate the existence of a right to contribution.

More importantly, section 501 rights and remedies are derived from Title VII, which, under *Northwest Airlines*, does not create a right of contribution. Thus, inasmuch as Congress took no action in 1978, when it created private rights of action by cross-reference under sections 501 and 504, to create a right to contribution, and because no such right explicitly or implicitly exists in section 501 or any other section of the Rehabilitation Act, we are unable to infer that Congress in 1978 would have created such a right had it crafted a more explicit private remedial scheme for violations of section 504. Thus, we reach our conclusion that there is no right to contribution under section 504 of the Rehabilitation Act.

Similarly, nothing in the ADA counsels in favor of recognizing a right to contribution for violations of Title II. The ADA's goals are familiar: (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities; (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; (3) to ensure that the federal government plays a central role in enforcing the standards established on behalf of individuals with disabilities; and (4) to invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities. 42 U.S.C. § 12101(b). Title I of the ADA prohibits discrimination in employment and provides that rights and remedies available under Title VII of the Civil Rights Act of 1964 are available under Title I. *Id.* § 12117. Title II prohibits discrimination by a "public entity." *Id.* § 12132. Rights and remedies available under section 504 of the Rehabilitation Act are available under Title II. *Id.* § 12133. Finally, Title III prohibits discrimination in public accommodations. *Id.* § 12182. Rights and remedies available under Title II of the Civil Rights Act of 1964 are available under Title III. *Id.* § 12188.

Although all three titles have similar purposes, that is, to eliminate discrimination in the sphere each one covers, Title I is more analogous to Title II than is Title III because Title I defendants stand in a position similar to Title II defendants for reasons comparable to those we discussed above with respect to defendants under sections 501 and 504 of the Rehabilitation Act. On the other hand, Title III defendants cannot be liable for money damages. *Id.* § 12188(a); *Wander v. Kaus,* 304 F.3d 856, 858 (9th Cir. 2002). Title I does not provide for a right to contribution nor does any court appear to have implied such a right. Furthermore, under *Northwest Airlines,* contribution is not available under Title VII. Even were we to consider Title III as another possibly analogous provision, neither Title III nor Title II of the Civil Rights Act of 1964 appears ever to have been held to create a right to contribution. Thus, we reach our conclusion that there is no right to contribution under Title II of the ADA. We, therefore, will reverse the district court's orders of November 7, 2001, and March 6, 2002, appealed at No. 02-3236, with respect to UMass and Delaware and remand the matter to the district court to dismiss the contribution claims against them under both section 504 and Title II.

We close with a final observation. In this case, we hold that Temple cannot have a right of contribution from UMass or Delaware State and, as Bowers has not sued them directly and there are no other claims pending against them, they will be dismissed from this action. But at this time we cannot be certain as to how the proceedings will go forward (beyond the case being dismissed as to all three third-party defendants) and we, therefore, cannot know whether Bowers will recover judgments against the defendants and, if so, whether the damages recovered will be duplicative and, indeed, how the district court will submit the case to the jury or, in the absence of a jury trial, itself calculate damages if Bowers establishes that the defendants are liable. Thus, we want to make clear that we do not intend to bar a party satisfying a judgment from seeking reimbursement in part from other judgment debtors. It may be that the district court will avoid the possibility that recovery against defendants will overlap by separating Bowers's case against the various defendants so

that damages against a liable defendant are ascertained individually. But we cannot be sure that this can or will be done, though surely it would be desirable to do so. In any event, we do not intend by this opinion to preclude the district court from entertaining arguments and granting relief to a party satisfying a judgment for which more than one defendant is responsible by allowing it to make a recovery from other defendants on some principle provided it is consistent with this opinion.

## IV.  CONCLUSION

For the foregoing reasons we will dismiss the appeals of Iowa at No. 01-4492, Memphis at No. 01-4226, and UMass at No. 02-1789. We will reverse the orders of the district court of November 7, 2001, and March 6, 2002, in No. 02-3236 insofar as the court finds that Temple has alleged a valid claim for contribution against the third-party defendants UMass and Delaware State. We will remand the case to the district court for further proceedings to carry out the directions in this opinion. In particular, Temple should refile its notice of dismissal as to Memphis and the district court shall dismiss the third-party complaints against UMass and Delaware State. Costs will be taxed in favor of UMass and Delaware State against Temple in No. 02-3236 but not in No. 02-1789. As between Iowa and Bowers costs shall be taxed in favor of Bowers. As between Memphis and Temple, no costs shall be taxed on this appeal at this time but Memphis may move in the district court for costs and counsel fees.

A True Copy:
    Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*